747 F.Supp. 1340 (1990)
BROWNING-FERRIS INDUSTRIES OF ST. LOUIS, INC., Charles Nowak and John Carrigan, Plaintiffs,
v.
The CITY OF MARYLAND HEIGHTS, MISSOURI, et al., Defendants.
No. 88-2522-C-5.
United States District Court, E.D. Missouri, E.D.
September 24, 1990.
*1341 Thomas M. Blumenthal, Gerald A. Rimmel, Michael Waxenberg, Susman, Schermer, Rimmel and Shifrin, St. Louis, Mo., for plaintiffs.
Timothy Walk, Clayton, Mo., Robert Krehbiel, Evans & Dixon, St. Louis, Mo., Howard Paperner, Clayton, Mo., for defendants.

ORDER, FINDINGS OF FACT, AND CONCLUSIONS OF LAW
LIMBAUGH, District Judge.
This case comes before the Court after a hearing before the Court sitting without a jury, and the submission of extensive Stipulation of Facts and submission of documents by the parties. The parties have stipulated to the jurisdiction of this Court pursuant to 28 U.S.C. §§ 1331 and 1343; 42 U.S.C. §§ 1983 and 1985; and 28 U.S.C. §§ 2201 and 2202. The parties have also stipulated that the venue of this Court is proper.
Based upon the evidence adduced, and the record presented to this Court as it appears in the Court file, the Court finds that the City of Maryland Heights, and the individual defendants, have infringed upon the plaintiffs' constitutional rights in violation of 42 U.S.C. §§ 1983 and hereby enters a permanent injunction against the defendants' further interference with the plaintiffs' operation of the sanitary landfill in question, the final development of the Property in accordance with the final development plan, or enforcement of the summonses issued by defendants.

FINDINGS OF FACT
This case involves the dispute over the use of an approximate 99-acre parcel of land located in St. Louis County, Missouri ("the Property"). In 1969 this Property was located in the unincorporated portion of St. Louis County, and was owned by Mrs. Margaret U. Schott and the Alton Brick Company. Using the name "St. Louis County Landfill, Inc.," Mrs. Schott and Alton Brick Company filed an application for license to operate a private dump or sanitary landfill on August 18, 1969 with the St. Louis County Council and the St. Louis County Health Commissioner. That license was granted on June 11, 1970 after the St. Louis County Council had passed Ordinance No. 5365. This Ordinance rezoned the Property for use as a sanitary landfill. No other use of the property was permitted by that Ordinance. Landfill operations began on the Property in approximately 1972, and have continued, subject to certain disputed periods which are not in question here, to the present date.
The record as presented to the Court is voluminous, but in pertinent part it appears *1342 that Alton Brick Company and St. Louis County Landfill, Inc. applied to and received licensure from the State of Missouri and St. Louis County from at least as early as March 15, 1976 to the present. This situation changed in two significant respects in 1985. The first was that Plaintiff Browning-Ferris Industries of St. Louis, Inc. ("B.F.I."), undertook the management of the sanitary landfill pursuant to a landfill agency agreement executed by Mrs. Margaret U. Schott, the Alton Brick Company, and the St. Louis County Landfill, Inc., as owners and operators and Plaintiff B.F.I., as agent, on May 3, 1985. Pursuant to that agreement BFI agreed to expend significant amounts of necessary labor, equipment, and material to improve the operation of the landfill, to control the disposition and treatment of the waste deposited there, and to implement various new procedures and operations for the environmental protection of the surrounding area.
The other significant event that occurred in 1985 was that Maryland Heights, the unincorporated area in the County in which the property was situated, became incorporated as a third-class city in the State of Missouri by an order of the St. Louis County Council dated May 9, 1985. As one of its first official acts, the City passed Resolution No. 3 on May 13, 1985, which recognized the validity of the then existing zoning ordinances which were in effect in St. Louis County and continued to be in effect. The City of Maryland Heights did not enact any comprehensive zoning ordinance until April of 1989.
At the center of this controversy is an ordinance adopted by the City Council of Maryland Heights some six weeks after its incorporation. This ordinance is numbered Ordinance No. 35 and is titled "An Ordinance Providing For Dumps, Dumping, and Landfills". The ordinance required licensure for anyone using any property within the City of Maryland Heights for the dumping or disposal of any garbage, refuse or other waste material of any kind. The ordinance set out the procedure for application for licensure and certain minimal regulations for that licensure.
It is clear on its face that this ordinance is an exercise of the police power of the City of Maryland Heights to control the safety and health of its inhabitants. The plaintiffs, however, challenge the ordinance in two aspects. The first aspect is a facial challenge to the validity of the ordinance. This challenge is based upon the fact that Ordinance No. 35 was passed without published notice being given to the public, and without the City holding a public hearing concerning the ordinance prior to its passage. Plaintiffs contend that the ordinance did not comply with Missouri State law and was not enforceable. The second challenge of the plaintiffs is that the ordinance was applied to the plaintiffs in an arbitrary and capricious manner in violation of their rights to due process of law and to equal protection.
The facts which support these contentions focus more on the City's treatment of BFI's application for an operating permit under Ordinance No. 35, than on the validity of its passage. Since the facts are in dispute concerning how Ordinance No. 35 was passed, the Court will only focus on the manner in which the City enforced the Ordinance.
Within the boundaries of the City of Maryland Heights as it now exists, there is at least one other landfill operation, which shall be referred to as "the North Landfill". On August 28, 1985, the City issued a letter which allowed the North Landfill to operate a sanitary landfill for one year. On October 24, 1985, the City issued a similar letter to operate a sanitary landfill to St. Louis County Landfill, Inc., the owner-operator of the B.F.I. Landfill. The City acknowledged the lack of any formal procedure at that time by which to permit such operations. Prior to the end of each respective one-year period, the two landfills made application to the City for renewal of their respective permits. The North Landfill submitted its application on August 5, 1986; B.F.I. submitted its application on June 27, 1986. The record reflects that after the Planning and Zoning Administrator submitted a 3-page examination of the North Landfill permit application, the City granted the permit to operate on September *1343 18, 1986, some six weeks after the initial application. In contrast to a rather detailed engineering report and plan prepared by the engineering and architural firm of Burns and McDonnnell for B.F.I., the North Landfill's application was accompanied, on the face of the record, by a short 3-page letter from that landfill's attorney. In contrast to the brief examination of the North Landfill operation by the Planning and Zoning Administrator of the City of Maryland Heights, the B.F.I. application was subjected to extensive review, including a 6-page examination by the City's Building Commissioner and a 23-page examination by the same Planning and Zoning Administrator of the City.
The examinations of the B.F.I. application by the Building Commissioner and the Planning and Zoning Administrator apparently occurred in early November of 1986. They are both detailed and technical in their content, and their conclusions are both favorable. The Building Commissioner found, in part:
All of the problems encountered in the last year can be traced to the operation of the landfill before BFI took over. Browning-Ferris is a worldwide organization. Depending on the measurement used, it is either number one or two in the world in the solid waste industry. They operate more than eighty (80) landfills throughout the United States.... Their tenure as operator of the St. Louis County landfill has been plagued by problems caused by improper activities in the past. The reports of inspections by St. Louis County reflect an effort by BFI to get control of the landfill.... It is fair to say that these deficiencies do not reflect BFI's ability or intention to run the landfill properly, but, rather, an attempt to get the landfill into shape.... The plan prepared for BFI by Burns and McDonnell is well thought out. Their plan for handling the critical facets of landfill management will enable them to provide a much needed service to our citizens, while maintaining the landfill in a safe condition. Their on-site staff have shown an understanding of landfill problems, especially those connected with the existing landfill. The company has spent a lot of money rectifying existing conditions, and if the permit is granted, will spend a lot more. I feel confident that, should the Council decide to grant the permit, BFI personnel will work closely with local and state officials to maintain the landfill as an asset to the City.
The Planning and Zoning Administrator made similar comments, the following of which are of particular note:
The zoning provisions of the current ordinance clearly permit the landfill use in this location although by conditional provisions. Our proposed ordinance will also conditionally permit landfill use in the Industrial districts.... The site of the proposed landfill expansion is probably not suitable for any use at the moment and is not likely to be usable unless it is filled. In addition, the pits and lagoons are a public health and safety hazard as they presently exist and the City's abilities to cause the present property owner to resolve those issues are probably weak. Once properly filled, this land area would have construction potential for light industrial buildings. ... It cannot be overlooked that once the fill is completed, the top covering has been placed, and seeding/landscaping has been done, the value of adjoining property may actually increase as will the value (and development potential) of the landfill property itself. Therefore the long term effect for both the land use and value aspects is actually positive. Since a landfill is generally viewed as a light industrial use and light and planned industrial use is the recommended use in the plan, the operation of the landfill is not in conflict with either current zoning or land use plan.... In summary, while the site might not be an appropriate landfill location if the property were in its natural state, we believe that (all things considered) the City will gain in the long run by having this property filled.... On balance our assessment which follows indicates that considering both short and long term needs and *1344 impacts, the City is better off permitting the expanded operation....
In spite of the findings cited above, the Planning and Zoning Commission held a hearing on November 11, 1986 and recommended denial of B.F.I.'s application. It appears from the evidence that the reason for this in part was a report from one of the Planning and Zoning Commissioners which relied heavily on complaints by "several members of the existing business community abutting the landfill", though no specific reasons for the denial were stated.
Ordinance No. 35 requires that after the Planning Commissioner and the Health Commissioner have submitted their reports and recommendations to the City Council, including transcripts of any hearings, the City Council shall consider the reports and recommendations and shall either issue the license or deny the application. It appears from the record that no such reports were forwarded to the City Council and there is no reference to any hearings on the matter after the November 11 Planning and Zoning Commission hearing until August 6, 1987. At this meeting there was significant public comment including a petition from adjacent property owners to the B.F.I. landfill. No action was taken at the meeting and the hearing on B.F.I.'s application was continued to August 10, 1987 where a second meeting was held. Again after extensive public discussion, no action was taken at that meeting.
The issue apparently came up again on November 5, 1987, November 19, 1987, January 21, 1988, April 21, 1988, June 2, 1988, June 16, 1988, November 9, 1988, and November 17, 1988. At no time in any of these meetings did the City Council vote to approve or deny the application for license of B.F.I. Finally, at a meeting held on December 1, 1988, the City Council voted to deny the application of B.F.I.
Each of the various meetings of the City Council is accompanied by transcripts and voluminous technical reports from all parties and other participants which are made a part of the record. The City was also confronted with the rather clamorous testimony provided by neighboring businesses and citizens to the City Council. It must also be noted that during this time both the state and the county governments continued to issue their licenses for both the continued operation of the landfill and the expansion of the landfill by B.F.I. within the original licensed and zoned perimeter of the Property.
Two facts are clear from this evidence. The first is that the substantial weight of the scientific and technical evidence favors the operation and expansion of the Landfill. The second is that the Defendants in their public statements and actions showed a predisposition to ignore the weight of such evidence and to submit to the public opinion.
During this extended controversy, B.F.I. continued to operate the landfill. The City made no protests against such operation nor did it take any action until January 1988. On that date it entered into a 24-day period in which it issued twelve (12) summonses, roughly one every other day, to an employee and agent of the Plaintiff B.F.I., Plaintiff John Carrigan. Each of the summonses indicated that they were being issued for violations of Ordinance No. 35. On January 21, 1988, the City Council passed Ordinance No. 88-378, an ordinance which repealed certain sections of Ordinance No. 35 and enacted new sections in their place. The ordinance was signed by the Mayor on February 4, 1988. While the new ordinance changed various provisions of Ordinance No. 35, it did not repeal Ordinance No. 35 in its entirety, but only to the extent that Ordinance No. 35 was inconsistent with the new ordinance. The City issued no further summons against agents or employees of B.F.I. until October 5, 1988. At that time, the City entered into a 4-month period wherein it issued fifty-seven (57) summons against Plaintiff Charles Nowak, another agent of the Plaintiff B.F.I. Each of these summons were also for alleged violations of Ordinance No. 35. A total of sixty-nine (69) summons were issued to agents of B.F.I. carrying a possible total fine of $34,500.00 and over 17 years in prison.
*1345 At the current time, BFI continues to operate the landfill, and does so on a 24-hour per day basis.
In addition to the matters set out above, the parties have cited the Court to numerous county and state laws which affect and control the operation of landfills. These laws, and further facts which are relevant to the Court's conclusions as set out below will be discussed with those conclusions.

CONCLUSIONS OF LAW
This is a civil action filed on December 30, 1988. The plaintiffs seek declaratory and injunctive relief and damages against the defendants for the defendants' alleged violation of plaintiffs' constitutional rights pursuant to 42 U.S.C. §§ 1983 and 1985. The Defendant City of Maryland Heights, in response to the plaintiffs' complaint, has counter-claimed for declaratory and injunctive relief acknowledging the authority of the City to regulate its use of land within its boundaries and enjoining the plaintiffs from operating the landfill as a violation of Ordinance No. 35. The parties have stipulated to the jurisdiction and venue of this Court, and the Court finds upon review of the record that this Court has jurisdiction over the matter pursuant to 42 U.S.C. §§ 1983 and 1985, 28 U.S.C. §§ 1331, 1343, 2201, and 2202. The Court also finds that venue is appropriate.
As a threshold question the Court must determine whether the plaintiffs have brought an appropriate action under the Civil Rights Act, 42 U.S.C. § 1983 against the City of Maryland Heights.
It is clear that the individuals are persons who can bring an action under § 1983, and the courts have held that a corporation is also a person for the purposes of bringing a § 1983 action. Fulton Market Cold Storage Company v. Cullerton, 582 F.2d 1071 (7th Cir.1978), cert. denied 439 U.S. 1121, 99 S.Ct. 1033, 59 L.Ed.2d 82 (1979). The law is also now clear that cities are persons for the purpose of § 1983 liability. Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).
The extent to which Monell has been applied is confusing at best. Attempts to define the extent of liability in cases before the Supreme Court have met with only mixed results and plurality opinions on the crucial question of exactly when municipal liability attaches under § 1983. Pembaur v. Cincinnati, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); City of St. Louis v. Praprotnik, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988).
Certain things are plain. It is clear for instance, that a municipal corporation may be held liable for a single decision by the policy makers of the municipality, because the acts of such policy makers, particularly its properly constituted legislative body, are unquestionably acts of official governmental policy. Pembaur, 475 U.S. at 480, 106 S.Ct. at 1298. The Supreme Court has even refused to recognize the defense of good faith immunity for such actions. Owen v. City of Independence, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980).
The acts challenged here are the acts of the City through its lawfully constituted City Council. The City has admitted that the City Council is the final policymaker in the area of granting sanitary landfill licenses. (See Defendants' Response to Court order dated May 17, 1989, p. 4.) Defendants have also admitted that the City Council was responsible for the enactment of Ordinance 35, the procedures which were followed or failed to be followed in pursuance of Ordinance 35, the granting and renewal of the license to the North Landfill, and the length of time spent in reviewing the Plaintiffs' application for a sanitary landfill license. (Id., p. 4-5). If these acts constitute violations of the plaintiffs' constitutional rights, the Court finds that they would be violations of § 1983 as official acts of the City. This finding is given additional weight by the fact that the dispute between the City and the plaintiffs has existed for almost the entire life of the City. It is therefore "so permanent and well-settled as to constitute a `custom or usage' with the force of law." City of St. Louis v. Praprotnik, 485 U.S. at 127, 108 *1346 S.Ct. at 926; quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 167-168, 90 S.Ct. 1598, 1613, 26 L.Ed.2d 142 (1970).
Liability will also attach if there is a continued failure by the policymaking authority to remedy a known pattern of constitutionally offensive conduct by its subordinates. Herrera v. Valentine, 653 F.2d 1220, 1224 (8th Cir.1981). In order to sustain such a claim, the Plaintiff must show that the government had notice of prior misbehavior, that it failed to act with deliberate indifference to further constitutional violations, and that such failure to act proximately caused the injury. Baker v. McCoy, 739 F.2d 381, 384 (8th Cir.1984).
Two actions of the City lead the Court to conclude that the City is subject to § 1983 liability under this test of a known pattern of constitutionally offensive conduct. The first is that the terms of Ordinance No. 35 specifically require that the Health Commissioner and the Planning Commission submit reports and recommendations to the City Council, including transcripts of hearings, and state the reasons why they recommend that an application be granted or denied. This requirement is found in Section 9 of the City's Ordinance No. 35, and has been unchanged by subsequent amendments to that ordinance. "The City Council shall then consider the reports and recommendations so transmitted by the Health Commissioner and the Planning Commission...." Section 9, Ordinance No. 35. The record before the Court reflects that the Planning & Zoning Commission, while denying the Plaintiffs' application, gave no reason for its action and issued no report. The City proceeded to consider this matter for two years after the Planning & Zoning Commission's action, and made no move to require the reports and reasoning mandated by their own ordinance.
The other act of the City which suggests a failure to remedy a known pattern of constitutionally offensive conduct by its subordinates is the issuance of a total of 69 summons over a 13-month period to the individual Plaintiffs. The record indicates that the City Council knew of the issuance of the summonses as early as January 21, 1988. The Council was also well aware of the application of Plaintiff B.F.I. pending before it. Nevertheless, the City took no action either to have the summonses dismissed or to terminate their issuance. Indeed, by amending Ordinance No. 35 with Ordinance No. 88-378 the City enhanced the punishment for future violations, including the imposition of incarceration. Because of the findings below concerning the implication of this conduct, the Court finds that this conduct evidences a policy of the municipality and rises to the level of conduct for which the City is liable under § 1983.
The next issue which the Court must examine is the extent to which the conduct of the City implicated constitutionally protected rights of the plaintiffs. In this examination two issues must be addressed. The first is the challenge of whether Ordinance No. 35 is a lawfully enacted ordinance of the City of Maryland Heights, which is factually disputed by the parties. The second is whether the plaintiffs complied with the Ordinance, if it is lawfully enacted, and whether the City complied with the terms of its own ordinance if it is lawfully enacted.
The second issue is the only issue the Court needs to address, for particularly in cases raising questions of unconstitutional taking of private property, the constitutionality of statutes or ordinances ought not to be decided unless such a decision is necessary. Hodel v. Virginia Surface Mining and Reclamation Assoc., 452 U.S. 264, 294-95, 101 S.Ct. 2352, 2369-70, 69 L.Ed.2d 1 (1981). The Court has already found that the City failed to comply with its own terms as set out in Ordinance No. 35. If the ordinance is lawfully enacted, by failing to follow its own established procedure the City denied Plaintiff B.F.I. procedural due process rights in failing to hold a hearing as established by the Ordinance. It is also clear from the record that Plaintiff B.F.I. complied with all the requirements in filing its application pursuant to Ordinance No. 35. The Plaintiff, having complied with the requirements of the Ordinance, *1347 and the City having failed to comply with the requirements of the Ordinance, the only question remaining is whether these facts constituted deprivation of the Plaintiff B.F.I.'s constitutional rights.
Property interests "are created and their dimensions defined by existing rules or understandings that stem from an independent source such as state law  rules or understandings that secure certain benefits and that support their claims of entitlement to those benefits."
Zenco Development Corp. v. City of Overland, 843 F.2d 1117, 1118 (8th Cir.1988); citing Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Following this teaching as reiterated in Zenco it is necessary to examine state law to define B.F.I.'s property right in this instance.
In Hoffmann v. Kinealy, 389 S.W.2d 745 (Mo. banc 1965), the Missouri Supreme Court dealt with a case of first impression in deciding that a constitutionally protected property interest was implicated when a City Board of Adjustment denied a certificate of occupancy for a pre-existing, nonconforming use of property rezoned by City ordinance.
Property is defined as including not only ownership and possession but also the right of use and enjoyment for lawful purposes. In fact, "[t]he substantial value of property lies in its use." It follows that: "`[t]he constitutional guarantee of protection for all private property extends equally to the enjoyment and possession of lands. An arbitrary interference by government, or by its authority, with the reasonable enjoyment of private lands is a taking of private property without due process of law, which is inhibited (sic) by the Constitution.' ...".
Id., at 752-753 (citations omitted). The Court went on to find that pre-existing uses could only be terminated over a reasonable period of time, and only when just compensation was provided. Id., at 753.
Recent U.S. Supreme Court decisions have clearly stated this position in the federal context, holding that governmental actions regarding land use decisions can have the effect of substantial interference with the value of property interests actionable under the Fifth and Fourteenth Amendments. If the land use regulation denies the owner economically viable use of his land, it can constitute a Fourteenth Amendment taking. Nollan v. California Coastal Commission, 483 U.S. 825, 834, 107 S.Ct. 3141, 3146, 97 L.Ed.2d 677 (1987). "[W]hile property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." First English Evangelical Lutheran Church v. County of Los Angeles, 482 U.S. 304, 316, 107 S.Ct. 2378, 2386, 96 L.Ed.2d 250 (1987); citing Pennsylvania Coal Company v. Mahon, 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922). Conversely, where an owner possesses a full range of property rights, the destruction of only one aspect or "strand" of that "bundle" of rights is not a taking when the rights are viewed in their entirety. Keystone Bituminous Coal Assoc. v. DeBenedictis, 480 U.S. 470, 497, 107 S.Ct. 1232, 1249, 94 L.Ed.2d 472 (1987).
Here the Court finds that the property was operated as a sanitary landfill from at least as early as 1972. Both State and County licenses have been and are in full force and effect. Since acquiring title to the landfill, the Court finds that the Plaintiff B.F.I. has managed and operated the landfill in full compliance with all County and State laws and regulations with the exception of only de minimus violations. The only authorized use for the property until April of 1989 was as a landfill.
The new zoning under the revised Zoning Code of the City of Maryland Heights as an M-1 District, designated light manufacturing, does not authorize the property to be used as a sanitary landfill. While the new Zoning Code does not specifically address sanitary landfills, it does allow permitted uses such as gas pressure control stations, janitorial services, sewage pressure control stations, solid waste transfer stations, truck wash services, storage and warehousing of non-hazardous products, and other similar functions. But the new Zoning Code makes no mention of dumping, sanitary *1348 waste disposal, sanitary waste treatment, or the existence of landfills.
Plaintiff B.F.I. has operated the landfill prior to the existence and incorporation of the Defendant City. It has lawfully had the right to use and enjoy the Property since prior to the incorporation of the City, and now owns the Property. It has consistently complied with all State, Federal and local laws concerning the use of the Property with the exception of only de minimus violations. As late as April of 1989, the only lawful use for which the Property was zoned was that as a sanitary landfill. The expert of the Defendant City has stated in his report that the Property is not suitable to be used as anything except a sanitary landfill until it is filled and properly closed in accordance with applicable federal, state and county laws, regulations and ordinances.
The Court finds that Plaintiff B.F.I. had a vested property right in the Property as a perfected prior non-conforming use which lawfully existed prior to the existence of the Defendant City and the enactment of any of the City's zoning or regulatory ordinances. Since the Plaintiff B.F.I. has continued to maintain the use of the Property after the incorporation of the City and the passage of its various ordinances, the City's denial of a permit based upon these regulations constituted a taking of private property without compensation. Missouri Rock, Inc. v. Winholtz, 614 S.W.2d 734, 739 (Mo.App.W.D.1981). The City's ordinances, prior to its current zoning ordinance passed in April of 1989, did not exempt prior existing uses, and those ordinances must be construed as having only prospective effect and cannot be applied to the operation of the landfill on the B.F.I. property. Id. The new Zoning Code does not provide for landfills at all, but allows perfected prior non-conforming uses, so the landfill continues to exist as a perfected prior non-conforming use. The Court also relies on the statement of the City's Planning & Zoning Administrator that "a landfill is generally viewed as a light industrial use and light and planned industrial use is the recommended use in the plan," referring to the planned, now current, Zoning Code of the City. Finally, the Court relies on the Planning & Zoning Administrator's statement that the property is not suitable for any other use than a landfill until and unless it is filled.
The Court has examined the engineering report prepared by the plaintiffs' experts, and the photographs and drawings which together show the current standards under which the plaintiff B.F.I. is operating and, when augmented by the drawings for future uses and proposed timetables which the Plaintiff has provided, show the final development plan of how the Plaintiff B.F.I. intends to complete the landfill and the period in which it intends to complete the landfill. The Court finds these standards and plans to be reasonable and to fulfill the stated requirements of Ordinance No. 35 as set out in Section 12 of that Ordinance. The uses of the building to be constructed and the community and private uses of the land are acceptable post-closure uses.
The City has argued that the transfer of the licenses and ownership of the Property from the prior owner to the Plaintiff B.F.I. effected a termination of the prior existing use. This argument must fail since it is well recognized that a transfer or change of ownership is not an abandonment of the right to a non-conforming use. The use follows the land and not the person. Walker v. City of Kansas City, Missouri, 697 F.Supp. 1088, 1090 (W.D.Mo. 1988).
The Court also finds that the acts of the City in denying the requested permit to operate the landfill without demanding a report from the Planning & Zoning Commission and a transcript of its hearing, and without demanding a reason for the denial of the application by the Planning & Zoning Commission, violated its own ordinance requirements and was arbitrary and capricious. B.F.I. had complied with all of the requirements of the Ordinance No. 35 and yet was denied the appropriate treatment of its application. The City thus acted arbitrarily and capriciously and created a substantive due process claim which entitles the Plaintiff B.F.I. and the individual plaintiffs *1349 to relief. Littlefield v. City of Affton, 785 F.2d 596, 607 (8th Cir.1986).
This conclusion must also invalidate the summons issued to the individual plaintiffs pursuant to Ordinance No. 35 as violating the plaitiffs' procedural and substantive due process rights for attempting to prosecute plaintiffs for ordinance violations which were invalid or inapplicable as applied to the plaintiffs.
Further support for the result reached can be found in the Missouri case of West Lake Quarry & Material Company v. City of Bridgeton, 761 S.W.2d 749 (Mo. App.E.D.1988). In that case the plaintiff, Westlake Landfill, Inc., challenged the zoning of land adjacent to its sanitary landfill as a residential zoning. The landfill itself was zoned for manufacturing. The Missouri Court of Appeals cited case law which suggested that where a zoning ordinance restricts property to a use for which it is not adapted, such an ordinance invades the rights of the property owner and is unreasonable. Id., at 751. The Court found the residential zoning of property adjacent to a sanitary landfill to be arbitrary and unreasonable. Id.
The Court also finds a similarity in the instant case with the recent case of Geo-Tech Reclamation Industries, Inc. v. Hamrick, 886 F.2d 662 (4th Cir.1989). In Geo-Tech, the State of West Virginia denied a permit for the operation of a landfill to the Plaintiff based upon numerous public complaints which caused the State to find the application "significantly adverse to the public sentiment". The Fourth Circuit found this reliance upon public sentiment to be an arbitrary and capricious action of the State having no substantial relation to the welfare of the community. It therefore invalidated a state provision which allowed the State to base its judgment on that public sentiment. Id., at 667. In the instant case it is clear from the record that the City of Maryland Heights relied heavily on public sentiment in its numerous and frequent public hearings in ultimately denying the application of Plaintiff B.F.I. The Court finds this reliance upon public sentiment in the face of the substantial weight of the scientific and technical evidence to the contrary to be an arbitrary and unreasonable basis upon which to base the City's decision, and contrary to the teaching of Geo-Tech. See also; Southern Cooperative Development Fund v. Driggers, 696 F.2d 1347 (11th Cir. 1983).
As a result of the above findings and conclusions, the Court finds that it is unnecessary to reach the Plaintiffs' claims concerning the constitutionality of the manner in which Ordinance No. 35 was passed. The Court will not reach constitutional claims if it can reach its decisions on other grounds. Cf., Sentner v. Colarelli, 145 F.Supp. 569, 578 (E.D.Mo.1956), aff'd, 353 U.S. 963, 77 S.Ct. 1047, 1 L.Ed.2d 901 (1957); Simpson v. Kilcher, 749 S.W.2d 386, 390 (Mo. banc 1988). The Court, similarly, need not reach the Plaintiffs claims of denial of equal protection. The Court notes in passing that the treatment of the North Landfill was in stark and troubling contrast to the treatment of the plaintiffs herein, but, given the findings and conclusions above, need not reach the equal protection issue.
Finally, the Court must address the Plaintiffs various claims for damages. The Court notes that during the pendency of this litigation, and in fact during the three-plus years that Plaintiff B.F.I.'s application was pending before the City, the City did not take any overt steps to halt the operation of the sanitary landfill except the issuance of the summonses and the denial of the checker station permit. Neither did it take any overt steps to pursue the prosecution of these various summonses issued to the individual Defendants after the Joint Stipulation and Agreement entered by the Parties and ordered by the Court on March 7, 1989. The parties have indeed stipulated that "due to the agreements and stipulations between the parties, Plaintiff B.F.I. has not been required to stop operating the landfill on the property for any significant period of time." (Stipulation No. 43). As a result, the Court finds that any taking which the City affected by its treatment of the plaintiffs was a temporary taking. It *1350 has been held that a depreciation in value of property by reason of a preliminary or a temporary activity is not chargeable against a government entity. First Lutheran Church, supra, 482 U.S. at 320, 107 S.Ct. at 2388.
The Court also notes the natural reluctance of any governmental unit to allow use of property as a sanitary landfill, even when necessary to the general welfare, in the face of heavy and vocal opposition. While we have found this an arbitrary reason upon which to base a decision, these actions of the individual defendants did not constitute an active conspiracy under 42 U.S.C. § 1985, or conduct which requires the imposition of damages pursuant to 42 U.S.C. § 1983. The Court bases its findings on the conditions as they now exist and the realities which confronted the parties. Should the City or the individual Defendants violate the Order of this Court and the injunction which the Court enters today, the plaintiffs will be able to apply to the Court for enforcement of this Order.

ORDER
1. Based on the Findings of Fact and Conclusions of Law set out above, the Court hereby permanently enjoins the Defendants from interfering in any manner with the operation of the Plaintiff B.F.I. in its use of the Property as a sanitary landfill, as a disposal site for municipal waste, solid waste, special waste, sludges and other waste permitted by State and County regulations as they currently exist; for composting; for recapture and disposal or utilization of methane gases; for recycling operations; for truck maintenance and truck wash services; for other accessory uses incidental to the operation of a sanitary landfill on a 24-hour per day basis; for the future development as indicated in B.F.I.'s final development plan of the property for corporate building and parking, for development of public and private recreational uses; and for any uses allowed under the City of Maryland Heights Zoning Ordinance 89-481 for an M-1 zoned district.
2. While the Court finds that the operation of the sanitary landfill is a highly regulated industry, regulated by federal, state, county and municipal governments which all have some concurrent authority, the past conduct of the Defendants in relation to Plaintiff B.F.I. has been so arbitrary and capricious, and in such contrast to Defendants treatment of other landfill operators, that the Defendants are hereby enjoined and prohibited from attempting to further enforce ordinances, or regulate or require permits, approvals or licenses for the operations of and development by Plaintiff B.F.I. on the Property provided that Plaintiff B.F.I. continues to comply with all federal, state and county laws, ordinances or regulations concerning its operations and follows the final development plan as set out in the exhibits submitted to the Court. The Defendants shall be allowed to continue to monitor and inspect the operation of the Landfill in a reasonable manner to insure that this compliance occurs. Should the Plaintiff B.F.I. enter into operations which are not controlled by federal, state or county regulations, the Defendants may then enter into these areas and are not barred from regulation of activities that are not otherwise covered.
3. The defendants are hereby permanently enjoined from prosecution of any of the summonses or citations which have been issued against the individual Plaintiffs John Carrigan or Charles Nowak and are ordered to dismiss such summonses with prejudice at the cost of the Defendant City.
4. The Court denies damages as requested by the Plaintiffs based on the circumstances at this time. At the same time, the Court recognizes that circumstances may change as the development of the Property continues to completion. The Court therefore retains jurisdiction over the parties for the later of five (5) years from the date of this Order or the completion of the final development plan as set out in the exhibits submitted to the Court in order to insure compliance with this Order and completion of B.F.I.'s final development plan. The Court also retains jurisdiction to approve changes and modifications *1351 to the final development plan in the event a change in circumstances requires such a change or modification.
5. The Court dismisses Counts II and III of plaintiffs' Complaint and defendants' Counterclaim for declaratory and injunctive relief as moot in light of the Court's judgment in favor of plaintiffs on Count I of their Complaint.
6. The costs of this action are taxed against the defendants. The plaintiffs are granted 21 days from the date of this Order, pursuant to local Rule 30, to file any claim for attorneys' fees which they wish to submit pursuant to 42 U.S.C. § 1988.
7. Even though the Court retains jurisdiction of this case as provided, the case shall be administratively closed.