(24 P.3d 175)

No. 85,148

M.S.W., INC., *Appellant*, v. THE BOARD OF ZONING APPEALS OF MARION COUNTY, KANSAS, *Appellee*.

Opinion filed May 11, 2001.

*David P. Calvert*, of David P. Calvert, P.A. of Wichita, and *Russell L. Mills*, of Sanborn & Mills, of Wichita, for the appellant.

*Rodney K. Murrow*, of Rodney K. Murrow, P.A., of Kansas City, Missouri, and *James M. Kaup*, of Logan Riley Carson and Kaup, L.C., of Topeka, for the appellee.

Before PIERRON, P.J., LEWIS, J., and BUCHELE, S.J.

PIERRON, J.: In 1998, the Board of Zoning Appeals of Marion County (Board) held that a quarter section of property owned by

M.S.W., Inc., (MSW) was zoned agricultural and that a conditional use permit (CUP) had been granted for the property in 1992 to permit continuation of landfill activity occurring since 1974. The Board held that the CUP was lawfully adopted in 1992 but was forfeited by closure of the landfill in 1996, and no nonconforming use had ever been created on the property. MSW appeals the district court's decision upholding the Board's ruling.

Tom Grosse owned the property in question in 1974 and, in that year, entered into a 20-year agreement with Marion County to provide a sanitary landfill. In 1976, Grosse received a permit from the Kansas Department of Health and Environment (KDHE) to operate a sanitary landfill on the entire quarter section. The property was unzoned prior to December 1, 1992.

On November 9, 1992, the initial zoning regulations for the unincorporated portions of Marion County were adopted by passage of Resolution 92-32 by the Marion County Board of County Commissioners (County). Pursuant to Resolution 92-32, the zoning regulations took effect on December 1, 1992. As part of the adoption of the initial zoning, the property was zoned agricultural with a CUP allowing use as a solid waste landfill (CUP-landfill). Neither the zoning of the property nor the issuance of the CUP-landfill were undertaken upon application by Grosse. Approximately 115 other CUPs were issued in a similar manner for unincorporated properties with the adoption of the initial zoning regulations in December 1992.

Grosse died in 1993 and Marion County Landfill, Inc., (MCLI) was formed to operate the landfill. On December 12, 1994, MCLI contracted with the County to extend the landfill use until October 8, 1996. In October 1995, KDHE notified MCLI that it was operating a landfill without a permit and steps would need to be taken to bring the operation into compliance with state law. Later in October 1995, Browning Ferris Industries of Kansas (BFI) announced its intent to purchase MCLI and to develop the landfill into a full federal Subtitle D landfill. MCLI communicated this intent to the KDHE. On June 10, 1996, the December 12, 1994, agreement between the County and MCLI was terminated by the County and acquiesced to by MCLI. The KDHE entered an order

on June 11, 1996, permitting MCLI to continue solid waste disposal until October 9, 1996.

On August 8, 1996, BFI signed a contract to buy the property. On September 9, 1996, MCLI advised the County in an open meeting that a vertical expansion permit application had been completed for the current landfill which would be for 5 years or until BFI opened a Subtitle D landfill. The minutes of the open meeting state that MCLI was "informed that the proposal for vertical expansion should have been on the table before now as other arrangements were nearing completion for disposal of solid waste and that the proposal would require some thought."

After October 8, 1996, the landfill closed and to date has not received any waste. The October 8, 1996, date coincides with the date when Subtitle D landfill standards took effect and the requirement that in order to continue operations, a landfill was required to have a vertical expansion certificate. On September 2, 1997, BFI terminated its purchase agreement with MCLI.

In 1998, MSW purchased the property from MCLI. On February 27, 1998, MSW filed an application for approval to establish and operate a municipal solid waste disposal site located on 130 acres of the property. The other 30 acres of the property is where the old MCLI landfill existed.

In order to receive the necessary landfill permits from the KDHE, MSW was required, pursuant to K.S.A. 1997 Supp. 65-3407, to obtain certification by the local planning and zoning authority that the proposed disposal area was consistent with local land use restrictions. In a February 27, 1998, letter, MSW requested certification under K.S.A. 1997 Supp. 65-3407. The Marion County Zoning Administrator, Herb Bartel, responded to MSW by letter dated March 2, 1998, stating: "I can only sign the certification as [is not] consistent with the local zoning. Both the nonconforming status and conditional use permit for a landfill located in the SW ¼, Section 14, T-20-S, R-3-E have lapsed."

MSW appealed Bartel's decision to the Board. The Board conducted public hearings on the matter on April 23 and 30, 1998. The Board held the record open for public comment and response and also received an in-depth summary and report concerning the

matter. The Board found no nonconforming use ever existed on the property because the property's use conformed with the agricultural zoning classification and the CUP-landfill designation that was granted as part of the initial zoning. The Board stated its conclusion was consistent with the law of existing uses of property under K.S.A. 2000 Supp. 12-758 because the landfill was not nonconforming. The Board then concluded that MCLI forfeited its CUP since it had not received any solid waste since October 8, 1996, and was subject to violation of § 21-104 of the Marion County Zoning Regulations that CUPs were forfeited where the permitted use was discontinued for a period of 6 months or longer.

Having found there was not a nonconforming use, the Board found it unnecessary to address whether MSW's operation of the Subtitle D landfill would be an illegal expansion, enlargement, or change in the nonconforming use. Parenthetically, it is difficult to see how it would not have been.

MSW appealed to the district court. MSW filed motions to admit additional evidence, have the court take judicial notice of a number of records, conduct a de novo hearing on the issue of preexisting nonconforming use, and also a summary judgment motion. The court denied all the motions and found the Board's decision was legal in all respects and conformed to state law and zoning regulations. The court adopted the Board's findings and conclusions as its own. MSW appeals to our court.

The parties disagree on the proper standard of review to be utilized by a district court in examining a zoning appeal. In *Combined Investment Co. v. Board of Butler County Comm'rs*, 227 Kan. 17, 28, 605 P.2d 533 (1980), the court set forth the following rules to govern the scope of judicial review for zoning matters. These concepts have been applied to the review of special use permit decisions. See *Daniels v. Board of Kansas City Comm'rs*, 236 Kan. 578, 585-86, 693 P.2d 1170 (1985).

"(1) The local zoning authority, and not the court, has the right to prescribe, change or refuse to change, zoning.
"(2) The district court's power is limited to determining
 (a) the lawfulness of the action taken, and
 (b) the reasonableness of such action.

"(3) There is a presumption that the zoning authority acted reasonably.

"(4) The landowner has the burden of proving unreasonableness by a preponderance of the evidence.

"(5) A court may not substitute its judgment for that of the administrative body, and should not declare the action unreasonable unless clearly compelled to do so by the evidence.

"(6) Action is unreasonable when it is so arbitrary that it can be said it was taken without regard to the benefit or harm involved to the community at large, including all interested parties, and was so wide of the mark that its unreasonableness lies outside the realm of fair debate.

"(7) Whether action is reasonable or not is a question of law, to be determined upon the basis of the facts which were presented to the zoning authority.

"(8) An appellate court must make the same review of the zoning authority's action as did the district court." *Combined Investment*, 227 Kan. at 28.

MSW argues the district court failed to consider additional, relevant evidence. The court in *Combined Investment* stated: "A district court reviewing a zoning decision of an administrative agency may take additional evidence that is relevant to the limited issues of reasonableness and legality of the order appealed." 227 Kan. 17, Syl. ¶ 1. MSW asked the court to take judicial notice of 19 documents consisting of over 300 pages.

K.S.A. 60-409 contains the standards for taking judicial notice. MSW partially relies on the district court's duty to take judicial notice of specific facts and propositions of generalized knowledge as are so universally known that they cannot reasonably be the subject of dispute under K.S.A. 60-409(a). MSW also relies on the court's discretionary ability to take judicial notice of duly enacted ordinances, government regulations, and specific facts and propositions of generalized knowledge which are capable of immediate and accurate determination by resort to easily accessible sources of indisputable accuracy under K.S.A. 60-409(b). A court is required to take judicial notice of the items listed in K.S.A. 60-409(b) if a party makes a request, furnishes the court with sufficient information to comply with the request, and adverse parties are given notice to respond to the request. K.S.A. 60-409(c).

The district court was not clear in its decision concerning the motion to take judicial notice. However, in its final journal entry, the court denied the presentation of any additional evidence be-

yond that which was presented to the Board. MSW's request for judicial notice is a mix of documents, some of which were already in the administrative record such as the 1992 zoning regulations and the zoning maps. MSW requested that the court take judicial notice of factual determinations such as that no CUP was ever physically issued to MCLI or Grosse when initial zoning was passed in 1992 and the zoning regulations do not specifically adopt any CUPs.

In *Combined Investment*, 227 Kan. at 27, the court stated: "Records of prior proceedings and also relevant evidence not presented to the commission are admissible, subject to judicial discretion. *Keeney v. City of Overland Park*, 203 Kan. 389, 394, 454 P.2d 456 (1969). See also *Rydd v. State Board of Health*, 202 Kan. 721, 451 P.2d 239 (1969)." Judicial discretion is abused only when no reasonable person would take the view adopted by the trial court. *Saucedo v. Winger*, 252 Kan. 718, 733, 850 P.2d 908 (1993) (McFarland, J., dissenting).

As appears below, none of the documents which the district court refused to take judicial notice of, if they were not already in the record, would have changed the decision. Even if the evidence would have been considered, it appears the trial court committed no error as the documents in question could not have affected the final ruling.

MSW also argues the district court erred in not conducting a de novo hearing on the issue of whether the nonconforming use had been abandoned. The court held that under the laws of the State of Kansas, an appeal from an administrative body is not entitled to a trial de novo by reason of being an appeal from an administrative body.

MSW's claim that it is entitled to a de novo hearing is clearly contrary to the principle set forth in *Golden v. City of Overland Park*, 224 Kan. 591, 595-96, 584 P.2d 130 (1978), that a district court is not free to make findings or factual determinations independent of those found by the governing body but is limited to determining whether facts could reasonably have been found by the zoning body to justify its decision. MSW correctly cites *Union Quarries, Inc., v. Board of County Commissioners*, 206 Kan. 268,

274, 478 P.2d 181 (1970), where the Kansas Supreme Court stated: "The district court ruled correctly that it had jurisdiction to determine in a de novo inquiry whether there had been a voluntary discontinuance of a nonconforming use for a particular period of time so as to result in its loss [under a zoning regulation]." However, the court in *Landau v. City Council of City of Overland Park*, 244 Kan. 257, 271, 767 P.2d 1290 (1989), held the trial court could not conduct its own review of the evidence in a zoning appeal and stated: "The trial court was definitely not to retry the case on the merits of the application."

The Board in the present case did not make a factual determination that MSW had abandoned a nonconforming use. Rather, the Board found there was never a nonconforming use of the property and that MSW had forfeited a CUP granted on the property in 1992. We do not find the district court erred in limiting itself to the record before the Board, unless the issue of the existence of the nonconforming use is resolved by us in M.S.W.'s favor, which it is not. On this issue, MSW argues the district court erred in not granting its motion for summary judgment.

MSW argues the Board violated Supreme Court Rule 141 (2000 Kan. Ct. R. Annot. 189) by failing to set forth in separately numbered paragraphs a concise summary of the conflicting evidence or testimony of the controverted factual contentions of the summary judgment motion. See *Bus. Opportunities Unlimited, Inc. v. Envirotech Heat. & Cooling, Inc.*, 26 Kan. App. 2d 616, 618, 992 P.2d 1250 (1999) (" 'Rule 141 is not just fluff—it means what it says and serves a necessary purpose.' ").

In the present case, the district court held that MSW's summary judgment motion was another attempt to introduce extraneous evidence which had not been presented to the Board. The court stated MSW's summary judgment motion was an attempt to alter the standards of review for an administrative appeal. The court stated that summary judgment motions are for cases where factual questions are not in dispute and there is simply a question of law and that in an administrative appeal the only question is one of law and not fact. The court held that summary judgment adds nothing

to an administrative appeal and MSW's request to add evidence was inconsistent with its own motion.

The district court did not err in denying MSW's summary judgment. We agree with the court that MSW's attempt to add evidence to the record to create issues of material fact contravenes the purposes of summary judgment. Although MSW relies on *Davis v. City of Leavenworth*, 247 Kan. 486, 802 P.2d 494 (1990), to support its argument that summary judgment was proper, the *Davis* court clearly stated that the conclusion of law to be rendered was "[w]hether the City's action was reasonable [which was] a question of law to be determined *upon the basis of the facts which were presented to the City.*" (Emphasis added.) 247 Kan. at 498. In an appeal of a zoning decision, the inquiry is whether the action was reasonable and lawful. Again, the additional evidence would not have changed the result.

The pivotal issue in this case is the legality of the County's initial zoning of the unincorporated, unzoned areas of Marion County and the simultaneous granting of 116 CUPs for existing uses. MSW argues the County acted illegally in granting the CUP in 1992. Pursuant to our standards of review, there is a presumption that the County acted legally and reasonably, and MSW has the burden of proving otherwise by a preponderance of the evidence. *Combined Investment*, 227 Kan. at 28. MSW also argues the Board's decision was arbitrary and capricious for essentially the same reasons.

MSW argues the procedures for the adoption of CUPs as set forth in the zoning regulations were not followed, namely that Grosse never applied for the CUP, the County never specifically voted on or adopted the CUP, there was never a development plan prepared, and a written document was never issued.

The zoning regulations have procedures and requirements for obtaining a CUP. Pursuant to the zoning regulations, the only way property can be used as a landfill in Marion County is by a CUP. Pursuant to Regulation § 21-103, a CUP can be granted for: "Solid waste disposal area, construction/demolition landfills, industrial landfills, or other solid waste processing facility or scrap material

recycling and processing facility." The zoning regulations set forth the following procedures to obtain a CUP:

"Before the location or establishment thereof, or before any change or use of the premises existing at the time of the effective date of these Regulations or permitted as herein provided is made, a development plan in sufficient detail and a statement as to the proposed use of the buildings, structures, and premises shall be submitted to the Planning Commission as specified in Article 14 of these Regulations. The Planning Commission shall hold a public hearing following the provisions also outlined in Article 28 of these Regulations and shall review such development plan and statements and shall, after a careful study of the effect that such buildings, structures, or uses will have upon the surrounding property, submit a recommendation to the Governing Body.

. . . .

". . . In this regard, the Governing Body may impose reasonable conditions on the approval of a Conditional Use Permit including, but not limited to, those items identified in Article 14 of these Regulations." Regulation § 21-101.

MSW argues several Kansas cases hold that a zoning authority must have standards for the issuance of special permits before a special permit can be issued. However, both of the cases cited by MSW stand for the principle that a zoning authority cannot have arbitrary power to grant or refuse a special permit. See *Community Antenna TV of Wichita, Inc., v. City of Wichita*, 205 Kan. 537, 543, 471 P.2d 360 (1970) ("ordinance puts it in the power of the city commission to grant or refuse a franchise at will"); *Hudson Properties, Inc., v. City of Westwood*, 181 Kan. 320, 321, 310 P.2d 936 (1957) (ordinance failed to establish a uniform standard for application in that governing body was final arbiter of property rights). MSW states that in the case at bar, it was the testimony of Herb Bartel, the zoning administrator, that he made the sole decision which properties were given CUPs in 1992 and that it was the express intended purpose in granting the CUPs to "avoid the creation of nonconforming uses."

A municipality has no inherent power to enact zoning laws, and the power of a local government to accomplish zoning exists only by virtue of authority delegated by the state. *Julian v. Oil Co.*, 112 Kan. 671, 212 Pac. 884 (1923); 83 Am. Jur. 2d, Zoning and Planning § 4, p. 37. The planning and zoning powers of Kansas municipalities are derived from the grant contained in K.S.A. 12-741 *et seq.*

Pursuant to K.S.A. 12-741(a), the municipalities can enact or enforce any zoning laws and regulations as long as they are not in conflict with Kansas statutes.

Under K.S.A. 12-753, the board of county commissioners is authorized to divide the land within its boundaries into zones and districts. The statute further allows the municipality to regulate and restrict uses within each zone or district. K.S.A. 12-755(a) provides a nonexhaustive list of zoning regulations the governing body may adopt:

"(1) Provide for planned unit developments;

"(2) permit the transfer of development rights;

"(3) preserve structures and districts listed on the local, state or national historic register;

"(4) control the aesthetics of redevelopment or new development;

"(5) provide for the issuance of special use or conditional use permits;

"(6) establish overlay zones."

In its findings, the Board stated that K.S.A. 12-755 authorizes counties to adopt " 'zoning regulations . . . which . . . include . . . conditional use permits.' " MSW argues there is a substantial difference in what is stated in K.S.A. 12-755 and how it was quoted by the Board in its ruling. MSW argues K.S.A. 12-755 grants counties the authority to adopt zoning regulations which provide for the issuance and procedures in obtaining a CUP but not which allow the counties to issue CUPs themselves. MSW argues that neither K.S.A. 12-755 nor the Marion County zoning regulations allow for CUPs to be issued within the initial zoning regulations. MSW maintains it is impossible to impose a CUP on a zone or district that does not yet exist.

The Board contends the necessary precautions in considering a CUP for a new use are not needed in the consideration of allowing a CUP for an existing use. For an existing use, the surrounding property owners are already aware of the nature of the use and its impact on neighboring properties. The Board argues no purpose is served in requiring the existing use owner to take the necessary steps for granting a CUP to a use existing at the time initial zoning is adopted.

There is no authority in the Kansas statutes expressly authorizing a county to adopt CUPs at the same time initial zoning regulations are established under K.S.A. 12-753. By the same token, there is no authority expressly prohibiting the county from doing so. The fact that the legislature has provided a nonexhaustive list of zoning regulations in K.S.A. 12-755, in conjunction with the policy that zoning authorities have control over zoning matters as long as there is no conflict with state law, supports the Board's position that the Kansas statutes do not prohibit the establishment of CUPs at the time of initial zoning.

Counties and cities have the authority to adopt zoning for the betterment of the community. The court in *Delight Wholesale Co. v. City of Overland Park*, 203 Kan. 99, 102, 453 P.2d 82 (1969), stated:

> "It is conceded by appellant that since the adoption of the Home Rule Amendment (Art. 12, Sec. 5, Kansas Constitution) the cities have broad powers of self determination. It has always been the policy of this state to confer on cities the power to pass ordinances to protect the safety, health and general welfare of its citizens."

Was the County required to follow the procedures for issuing a CUP when the CUP was issued simultaneously with the initial zoning in Marion County?

We agree with the statement in The Summary and Report to the Marion County Board of Zoning Appeals: "The issuance of a CUP-Landfill has the same consequence for the landowner as a zoning classification of 'Landfill,' had such zoning classification existed as part of the County's zoning regulations, *i.e.*, [b]oth allow land to be legally used for landfill purposes."

We do not believe this case is substantially different from one where the zoning authority, in its initial zoning regulations, zones certain property as landfill instead of zoning it agricultural. There are no statutory provisions that would prevent the zoning authority from making the landfill designation.

There is, however, a strong counter argument. K.S.A. 2000 Supp. 12-758(a) provides: "Except as otherwise provided by this section and K.S.A. 2000 Supp. 12-770 and 12-771, and amendments thereto, regulations adopted under authority of this act shall

not apply to the existing use of any building or land." If the County is allowed to adopt CUPs within the initial zoning regulations, does such a process eliminate the existing use provision in K.S.A. 2000 Supp. 12-758(a) and give the statute no effect? K.S.A. 12-741 allows municipalities to enact or enforce any additional laws and regulations as long as they are not in conflict with Kansas statutes. MSW argues the County's adoption of the CUP in 1992 violated the statutory language in K.S.A. 2000 12-758(a) prohibiting zoning regulations from applying to existing uses of buildings or land.

By definition, an existing or nonconforming use is a lawful use of land or buildings which existed prior to the enactment of a zoning ordinance and which is allowed to continue despite the fact it does not comply with the newly enacted use restrictions. See *Johnson County Memorial Gardens, Inc. v. City of Overland Park*, 239 Kan. 221, Syl. ¶ 4, 718 P.2d 1302 (1986); *City of Norton v. Hutson*, 142 Kan. 305, Syl. ¶ 1, 46 P.2d 630 (1935); 1 Anderson, American Law of Zoning § 6.01 (2d ed. 1976).

MSW argues the protection of existing uses in K.S.A. 2000 Supp. 12-758 and various provisions of the zoning regulations prohibit the granting of CUPs within initial county zoning regulations. The zoning regulations address nonconforming uses in two respects. First, the regulations define "Nonconforming Buildings, Land and/or Use" in Regulation § 1-102(157). Second, Article 24 of the zoning regulations is devoted entirely to nonconforming uses. Regarding nonconforming uses of land, Regulation § 24-102 provides:

"Where open land is being used as a nonconforming use at the time of the enactment of these Regulations, and such use is the principal use and not accessory to the main use conducted in a structure, such use may be continued; provided, such nonconforming use shall not be extended or enlarged, either on the same or adjoining property. The protection afforded to nonconforming use of land by this section applies only to such land held under ownership or lease agreement for said activity on or before the effective date of these Regulations, but shall not apply to new lands purchased or leased after said date. In addition, said protection shall not apply to any activities not legal under the terms of the regulations which these Regulations replace."

MSW reminds the court that zoning ordinances, being in derogation of the right of private property, should be liberally construed

in the property owner's favor, and where exceptions appear they are liberally construed in favor of the property owner. *Koppel v. City of Fairway*, 189 Kan. 710, 713, 371 P.2d 113 (1962) (citing 8 McQuillin, *Municipal Corporations*, 3 Ed. Rev., § 25.72).

MSW's main contention is that the Board's action converted its vested right of a nonconforming use landfill into a nonvested right of a conditional use of property as a landfill without any due process.

In order to avoid violation of constitutional provisions preventing the taking of private property without compensation, zoning ordinances must permit continuation of nonconforming uses in existence at the time of their enactment. *Missouri Rock, Inc. v. Winholtz*, 614 S.W.2d 734, 739 (Mo. App. 1981). MSW argues the Board's conversion was an unconstitutional taking of private property without compensation in violation of the Fifth and Fourteenth Amendments to the United States Constitution. See *Hoffmann v. Kinealy*, 389 S.W.2d 745 (Mo. 1965); *State ex rel. Capps v. Bruns*, 353 S.W.2d 829 (Mo. App. 1962); *Lewis v. City of Atlantic Beach*, 467 S.2d 751 (Fla. App. 1985).

One of the cases relied heavily on by MSW is *Browning-Ferris Indus., v. City of Maryland Heights*, 747 F.Supp. 1340 (E. D. Mo. 1990). In *Browning-Ferris*, the subject property was a landfill located on unincorporated property. The facts are not clear as to the property's zoning classification, but the owner of the property received licenses from the county to operate a private dump or sanitary landfill. Later incorporation of the property into a city led to the eventual denial of an application to continue using the site as a landfill.

The *Browning-Ferris* court found the landfill had a "vested property right in the property as a perfected prior non-conforming use which lawfully existed prior to the existence of the Defendant City and the enactment of any of the City's zoning and regulatory ordinances." The court held that since the landfill continued after the incorporation and passage of the ordinances, the City's denial of a permit based upon the regulations constituted a taking of property without compensation. 747 F.Supp. at 1348.

The distinguishing factor in *Browning-Ferris* is that a nonconforming use existed. In the present case, the County did not offend an existing or nonconforming use but instead prevented the creation of a nonconforming use in its initial zoning regulations. Further, there is no evidence presented in the record that the operation of the landfill by Grosse in 1992 was changed, altered, or even affected by the County's issuance of the CUP. The Board indicated that in 1992 Grosse received all the protection under the zoning regulations he was entitled to. The Board stated:

"By giving landowners CUPs that matched their existing uses—and thereby avoiding creating nonconforming uses—those landowners received a clear benefit. Nonconforming use status subjects the landowner to the risk of loss of that status due to a number of reasons, including damage by fire, windstorm or other act of God; abandonment; amortization; expansion or enlargement; and change in nonconforming use.

"By receiving zoning in the form of both 'A' classification and a CUP-Landfill, the owner of this quarter section in December 1992 got from Marion County all the zoning protection he could under the County's regulations. The County made its zoning conform to the use existing on the quarter section, and thereby protected the existing uses from the negatives of nonconforming use status. By granting zoning of 'A' classification and CUP-Landfill, Marion County did not attempt to prohibit the use of the quarter section as a landfill or prohibit use for maintenance and storage facilities for equipment and operations related to landfill activities. The County allowed this property to be used for landfill purposes by its application of the available zoning categories, land use and development controls."

The Board claims the recipients of the 116 CUPs in 1992 were affected by the zoning regulations only in the sense that the actual use of their property was automatically deemed in compliance and protected for as long as the identified conditional use continued without an interruption of 6 months or longer.

We recognize that a nonconforming use is a vested right in Kansas. Only vested rights are protected by due process. It is essential to the establishment of a nonconforming use that the use be commenced prior to the enactment of the ordinance restricting such use. *Goodwin v. City of Kansas City*, 244 Kan. 28, Syl. ¶¶ 3-4, 766 P.2d 177 (1988). The term "nonconforming use" means a use of land which lawfully existed prior to the enactment of a zoning ordinance and which is maintained after the effective date of the

ordinance even though not in compliance with use restrictions. See *Johnson County Memorial Gardens*, 239 Kan. 221, Syl. ¶ 4.

We disagree with MSW's claim that the landfill on the property became a nonconforming use the instant the zoning regulations were passed in 1992 and such use remains until it is lost. The problem with MSW's position on nonconforming use is that the facts do not demonstrate that any landfill use on the subject property was ever nonconforming. The underlying purpose and intent of the nonconforming use doctrine and K.S.A. 2000 Supp. 12-758(a) is to protect those uses when new ordinances or regulations are enacted. The County's approval of the CUP-landfill fulfilled that intent and provided protective status for the recognized use.

The County's granting of CUPs simultaneously with the initial zoning regulations in order to avoid the creation of nonconforming uses is consistent with the disfavored status of nonconforming uses. The doctrine of nonconforming uses is recognized in Kansas but is not a favored status under the law. The court in *Goodwin*, 244 Kan. at 32, stated: "Courts have recognized and approved this policy of restriction and eventual elimination by ruling that the right to a nonconforming use is to be strictly construed. See, *e.g.*, *Wyatt v. Board of Adjustment-Zoning, Etc.*, 622 P.2d 85 (Colo. App. 1980); 1 Anderson, American Law of Zoning § 6.07." See also *Boyce Industries v. Mo. Hy. and Transp. Com'n*, 670 S.W.2d 147, 150 (Mo. App. 1984) (The protection afforded to a nonconforming use is not absolute and is subject to limitations as to the extension of the use, both in a functional and a temporal sense.); *Hoffmann*, 389 S.W.2d at 750 ("the spirit of zoning ordinances always has been and still is to diminish and decrease nonconforming uses").

Even the statutory authority protecting existing uses, K.S.A. 2000 Supp. 12-758(a), eliminates the use: "If a building is damaged by more than 50% of its fair market value such building shall not be restored if the use of such building is not in conformance with the regulations adopted under this act." Additionally, in K.S.A. 2000 Supp. 12-771, the legislature enacted statutory authority permitting the gradual elimination of nonconforming uses: "Nothing in this act is intended to prevent cities or counties from enforcing

local laws, enacted under other legal authority, for the gradual elimination of nonconforming uses." K.S.A. 2000 Supp. 12-771 was a codification of prior case law, e.g., *Spurgeon v. Board of Commissioners*, 181 Kan. 1008, 317 P.2d 798 (1957). In *Spurgeon*, the court upheld a Shawnee County zoning resolution which required the removal within 2 years of auto wrecking yards located in residential zones, even though they were lawful prior nonconforming uses.

The County was not secretive with its intention to avoid nonconforming uses by granting the 116 CUPs with the initial zoning regulations. In a situation of existing use, the zoning authority is faced with the choice of allowing the property owners to continue the nonconforming use or compensating the property owner for the value of the taken use. See *City of Monett, Barry County v. Buchanan*, 411 S.W.2d 108, 115 (Mo. 1967). In the case at bar, the County allowed Grosse to continue the existing use and made the use conforming by granting a CUP.

Having found the Board correctly determined that the property was properly zoned in 1992 as agricultural with a CUP-landfill, the resolution of this case depends upon whether the CUP was allowed to lapse. The Board found the 1992 CUP was forfeited as a result of closure of the landfill and discontinued operation of the permitted use.

Zoning regulation 21-104 provides with respect to continuance of a conditional use:

"A Conditional Use Permit shall be allowed to continue, unless specified otherwise as a condition of authorization, as long as all conditions placed on it are met; however, if that particular use ceases to exist for a period of six months, it will forfeit its Conditional Use Permit and will not be allowed to exist again unless a new application is made, a public hearing held and a new Conditional Use Permit approved."

The Board made a factual finding concerning the lapse of the CUP. Our standard of review does not permit us to substitute our judgment for that of the Board but requires us to determine whether (1) the Board acted fraudulently, arbitrarily, or capriciously, (2) the administrative order is supported by substantial evidence, and (3) the Board's action was within its scope of au-

thority. See *Hickman Trust v. City of Clay Center*, 266 Kan. 1022, 1036, 974 P.2d 584 (1999).

We find the Board's decision is supported by substantial evidence and is otherwise valid. "Substantial evidence is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved." *Sampson v. Sampson*, 267 Kan. 175, 181, 975 P.2d 1211 (1999). It is undisputed that the landfill closed on October 8, 1996, and discontinued its business of accepting and disposing of solid waste. The discontinuance of operations apparently remains today, and the landfill has clearly met the condition in zoning regulation § 21-104 of ceasing the approved CUP use for a period of 6 months. Further, during the 6-month period, the County no longer had a contract with Grosse, MCLI, or MSW for solid waste disposal services.

MSW finally contends the Board is estopped from making a determination different from it had in 1996. MSW cites a report from the Marion County Planning Commission (Commission) concerning BFI's application for a CUP for a large-volume landfill. In that report, the Commission stated:

"Marion County first implemented zoning regulations in 1992, locating the existing closed landfill site in the 'A' Agricultural zone, which does not permit sanitary landfill uses as-of-right. The Marion County Landfill has not applied for any permits under the current zoning regulations. Therefore, the closed landfill operated as a legal, nonconforming use."

MSW argues the Board should be estopped from holding that there had never been a nonconforming use landfill on the property.

First, the Board is not bound by any decision of the Commission. Second, MSW's claim is similar to that of someone claiming estoppel based on comments of city officials. The *Goodwin* court held: "A landowner is charged with knowledge of the zoning ordinances. Approval by city officials of a use which is prohibited by the ordinances is without effect." 244 Kan. 28, Syl. ¶ 7. Further, MSW can show no detrimental reliance on the Commission's statements.

The issue of waiver was also raised in argument by the Board to the district court. There was no objection in 1992 by Grosse to the proposed zoning regulations or the issuance of the CUP on his

property. The minutes of the Commission's meeting on September 22 and 24, 1992, state that the list of the CUPs that would be approved with the initial zoning was made available. The minutes state:

"In conclusion, Mr. Yearout [the zoning consultant from Wichita] pointed out the maps on the wall, showing proposed zoning districts, cities, and explained the legends. He pointed out that there were computer printouts that identify all conditional uses that would be included in this regulation. He invited those in attendance to inspect the maps and printouts."

The notice of the public hearing in all the area newspapers read in part: "Any person wishing to be heard regarding this matter [Marion Co. Zoning Regs.] may submit written comments to the Planning Commission prior to or at the public hearings or may present written and/or oral comments at such public hearings." There is no evidence Grosse ever objected to the CUP or the process by which it was granted. However, since we resolve this matter on more substantive grounds, we need not reach this issue.

MSW has failed to meet its burden of demonstrating by a preponderance of the evidence that the Board acted illegally or in an arbitrary manner.

Affirmed.