No. 46,671

T. F. Robinson, *Appellee*, v. The Board of County Commissioners of Osborne County, Kansas; Everett Yoxall, County Clerk of Osborne County, Kansas; and Shirley Curry, Treasurer of Osborne County, Kansas, *Appellants*.

(504 P. 2d 263)

Opinion filed December 9, 1972.

*Edwin D. Smith*, of Fisher, Patterson, Sayler and Smith, of Topeka, argued the cause, and *Donald D. Gregory*, county attorney, and *Donald Patterson*, of Fisher, Patterson, Sayler and Smith, of Topeka, were with him on the brief for the appellants.

*Don W. Noah*, of Noah and Noah, of Beloit, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

Foth, C.: Plaintiff had a contract with the Osborne county com-

missioners whereby they paid him $500 per month to furnish ambulance service in the county. When his contract expired the commissioners awarded a new contract to another operator. Plaintiff successfully sued to enjoin the commissioners from carrying out their new contract or from entering into any similar contract with anyone other than him so long as he continues to furnish ambulance service. The defendant commissioners and other county officials have appealed.

For many years ambulance service was furnished in Osborne county, as it was in many parts of the state, by local funeral directors as an adjunct to their main enterprises. By early 1968, however, those who had been serving the major portion of the county, and in particular the northeast communities of Osborne, Downs and Portis, went out of the ambulance business, claiming they were operating at a loss. Service remained only at Natoma, in the extreme southwest corner of the county. The operator there drew two-thirds of his business from the neighboring counties and made the bulk of his runs to hospitals in those counties. He, too, found it a losing business.

Plaintiff, then a farmer by trade, entered into a series of negotiations with the city fathers of Osborne, Downs and Portis over the question of starting a subsidized ambulance service in that part of the county. As a result of these meetings he bought a 1963 Pontiac stationwagon from one of the mortuaries and in March, 1968, went into the ambulance business with a $100 per month subsidy from the city of Osborne. A commitment of an additional $50 per month from the city of Downs led to the purchase of a new Plymouth stationwagon, and beginning in April, 1968, the city of Portis came through with another $25 per month.

This arrangement lasted through that year, but then the cities dropped their payments one by one until, in March, 1969, plaintiff was receiving nothing from the public coffers. Before reaching this unfortunate plight, however, he commenced negotiations with the county commissioners for a subsidy. He was not immediately successful, and for a time he was forced to operate without the benefit of public assistance. His efforts ultimately led to a contract dated August 28, 1969, calling for payments from the county of $500 per month, retroactive to July 1, 1969, and terminating December 31, 1969.

As this contract was nearing its expiration the commissioners

tendered plaintiff a new contract for the calendar year 1970, on identical terms as his old one. Plaintiff refused to sign this contract, maintaining that he would need more money. The figure he suggested was $1,000 per month. No true accord was ever reached, but on March 30, 1970, plaintiff did sign a new contract at $500 per month retroactive to January 1, 1970, to extend, however, only to July 31, 1970.

According to the commissioners he stated at that time that unless he received the $1,000 per month he demanded he would quit, and that he had bid on service in two other counties at $1,200 and $1,500 per month. They, in turn, indicated that they could not meet his demand and would have to look for someone else to furnish the needed service; the new contract with plaintiff was only a stop-gap arrangement. They thereupon proceeded to advertise in area newspapers for persons interested in furnishing the service to get in touch with them before June 1.

The only serious prospect turned up by the advertisements was Robert L. Burch, then the sheriff of Osborne county. Burch, like plaintiff when *he* first proposed to go into the ambulance business, had no equipment or experience, but figured to use the proposed subsidy contract to finance the venture. Burch offered to perform for $650 per month the services then being rendered by plaintiff under his contract.

Shortly before June 1, 1970, and before settling anything with Burch, the commissioners summoned plaintiff to see what his best figure would be. This meeting was inconclusive, but as he left plaintiff wrote the figure $750 on a piece of note paper, signed it, and left it with the commissioners. The commissioners naturally understood this to be his best offer for ambulance service; plaintiff testified and the trial court found that it was meant to be merely a figure for their guidance in preparing the next year's budget. He said it was based on $500 per month for his services and $250 per month for the operator at Natoma. While the trial court found that plaintiff did not *refuse* at this meeting to sign a new contract, it is equally clear that he did not *agree* to sign one, nor did he convey in any intelligible fashion that he might be willing to do so.

The upshot of it was that the commissioners contracted with Burch for $650 per month for one year, commencing on the expiration of plaintiff's contract on July 31, 1970. Burch proceeded to purchase the necessary equipment, and on August 1 he com-

menced business and the county commenced paying him the $650 per month.

In the meantime plaintiff was not idle. He consulted counsel who, on June 22, 1970, wrote to the commissioners setting forth his position that any contract for ambulance service entered into while plaintiff was providing service was invalid; he threatened suit if the contract with Burch were carried out. This letter evoked no response, nor did a follow-up letter of July 26, 1970, and the result was this action. There was a false start in that a petition filed September 18, 1970, was dismissed for failing to show plaintiff's standing to sue, and hence to state a cause of action; the amended petition on which the parties went to trial was filed December 2, 1970. Plaintiff, despite his threats, continued to operate his service and was doing so at the time of trial.

At the threshhold we are met with a challenge to plaintiff's standing to maintain the action, a point presented below and preserved on appeal. Plaintiff predicated standing on his dual status as a taxpayer and as a competing ambulance operator.

We would agree with defendants that as a mere taxpayer, affected no differently than other taxpayers, plaintiff lacked standing to challenge the alleged unlawful expenditure of county funds. *Haines v. Rural High School Dist. No. 3*, 171 Kan. 271, 232 P. 2d 437; *Dunn v. Morton County Comm'rs*, 162 Kan. 449, 177 P. 2d 207. However, as the operator of the only ambulance service in the county with which Burch's subsidized service would compete, we think he was affected differently from the general public, and thus fit into the well recognized exception to the general rule against private citizens' enforcing public rights. *Watson v. City of Topeka*, 194 Kan. 585, 400 P. 2d 689; *Tripp v. Board of County Commissioners*, 188 Kan. 438, 362 P. 2d 612. Estoppel wasn't pleaded, and we see no basis for a claim of laches. We therefore turn to the merits.

The case turns on the interpretation of the 1965 act (Laws 1965, ch. 200) which authorizes counties to furnish ambulance service to their residents at county expense, and a 1968 amendment to it (Laws 1968, ch. 42). Section 1 of the act now appears as K. S. A. 1971 Supp. 19-261. As amended in 1968 it now reads (with 1968 deletions stricken and additions italicized):

". . . 19-261. The board of county commissioners of any county ~~having a population of less than fifty thousand (50,000)~~ may

*provide as a county function or may* contract with any city, person, firm, or corporation for the furnishing of ambulance services within *all or any part of* their respective counties upon such terms and conditions, and for such compensation as may be agreed upon which shall be payable from the county general fund: *Provided,* . . . [here follow immunity and liability insurance provisions]. *The board of county commissioners shall not provide ambulance service under the provisions of this act in any part of the county which receives adequate ambulance service, but the county shall reimburse any taxing district which provides ambulance services to such district with its proportionate share of the county general fund budgeted for ambulance services within the county. Such reimbursement shall be based on the amount that assessed tangible taxable valuation of the taxing district bears to the total taxable tangible valuation of the county, but in no event shall such district receive from the county more than the district's cost of furnishing such ambulance services.*"

Section 2 of the act, now K. S. A. 1971 Supp. 19-262, requires that if the commissioners authorize service under 19-261 they shall establish by resolution a "minimum set of standards" for equipment and operation and for qualifications and training of personnel. The Osborne commissioners did not establish such standards by resolution but did incorporate them in the various contracts referred to.

Simply put, plaintiff's theory is that once he commenced operations he was furnishing "adequate ambulance service" in that part of the county he served, and so long as he met the standards contained in his contract the commissioners were forbidden by the italicized portion of the statute to provide other ambulance service. His view prevailed below. The trial court made findings of fact which included the substance of most of those recited above, and the following conclusions of law:

"1. The term 'adequate ambulance service' as used in KSA 19-261, has reference to the term 'minimum standards' which are to be fixed by the County Commissioners under KSA 19-262. In this instance the service provided under the contracts which were prepared by the County Commissioners specified the quality service which was 'adequate' for Osborne County.

"2. KSA 19-261 does not limit the prohibition that the County Commissioners shall not provide ambulance service in any part of the county which receives 'adequate ambulance service' to the reimbursement of taxing districts or to ambulance operators who are not being subsidized under the provisions of the act but applies to any ambulance operator who is providing 'adequate ambulance service'.

"3. The County Commissioners had no legal right to enter into nor carry out the contract of June 1, 1970, with Robert L. Burch. Any contract entered into for ambulance service in Osborne, except the Natoma area, with anyone except the plaintiff was illegal.

"4. The doctrine of laches is not applicable to the factual situation and is not a defense in this case.

"5. The contract between the County Commissioners and A. F. Pohlman for the providing of ambulance service in the Natoma area is not illegal under the court's decision.

"6. The plaintiff is entitled to the relief prayed for and the County Commissioners are enjoined from making any further payment under the written contract of Robert L. Burch, dated June 1, 1970, and from entering into any contract with anyone but plaintiff for the providing of ambulance service in Osborne County, Kansas, except the Natoma area, so long as plaintiff is providing adequate ambulance service in the remaining portions of Osborne County, Kansas."

The correctness of these conclusions, we think, depends on the meaning of the 1968 amendments to 19-261. The first two of these are not relevant here, *i. e.*, that the act is made applicable to all counties regardless of population and that the commissioners may operate their own service as an alternative to providing service through an independent contractor.

The third, that the commissioners may provide service in only part of the county, ties in with the fourth and crucial amendment, which was the addition of that part of the statute beginning, "The board of county commissioners shall not provide ambulance service under the provisions of this act in any part of the county which receives adequate ambulance service. . . ."

One obvious purpose and effect of these two provisions is to provide relief from double taxation to residents of a city, fire district, hospital district or other taxing subdivisions which is already furnishing adequate ambulance service at public expense. The county is not to invade those areas with its service, and is to reimburse such a taxing subdivision its pro rata share of the county-wide taxes levied by the county for ambulance service. It may be that this was *all* that was intended, for we note that the reimbursement provision is part of the same sentence which prohibits the county from providing service in areas already served. However, we are not prepared to so hold, for such a construction might mean that the legislature had authorized counties to provide service in competition with private entrepreneurs who were furnishing adequate service. We are reluctant to ascribe such an intent to the legislature without unambiguous language to that effect. (Cf. *State, ex rel., v. City of Hiawatha,* 127 Kan. 183, 272 Pac. 113; *State, ex rel., v. Kaw Valley Drainage District,* 126 Kan. 43, 267 Pac. 31; *State v. Kelly,* 71 Kan. 811, 81 Pac. 450.) We therefore assume that if

"adequate ambulance service" were being furnished in part of a county by a private operator county commissioners would have no authority to provide competing service. The question remains whether the service being furnished by plaintiff in this case was "adequate" within the meaning of the statute.

As a first step in resolving this question it seems appropriate to look at the situation confronting any county commissioners when they first contemplate putting their statutory authority into practical operation. The first and primary question they face is whether there is a need for county-furnished service, either through direct operation or by contract, *i. e.,* a "subsidy." Obviously if all of the county is receiving adequate service no need exists, and the county is forbidden to provide additional or competing service; if part of the county is being adequately served, the commissioners are not to duplicate existing services in that part at public expense. This is what the statute says.

What factors may the commissioners consider in determing whether existing service is "adequate"? The trial court agreed with plaintiff that "adequate ambulance service" under 19-261 means simply and exclusively service meeting the "minimum set of standards" established by the commissioners under 19-262. We think that logically this cannot be, because the commissioners are to establish minimum standards only *after* they have authorized service under 19-261, while *before* they authorize service they must determine that some part of the county is not receiving "adequate" service. As we see it the county-fixed minimum standards are designed solely to govern the *operation* of county-furnished ambulance service, and have nothing to do with the initial determination of the *need* for county-furnished service.

It seems to us that whether a need exists (*i. e.,* whether present service is "adequate") is a practical question, to be answered in the first instance by those epitomes of practicality, the county commissioners. It is they who are charged by law with the management of the county's business in general (K. S. A. 19-103, 19-212) and with this determination in particular; it is they who are the watchdogs of the public purse. Their judgment on matters entrusted to their discretion is not subject to review except for arbitrariness, capriciousness or bad faith. (See, e. g., *Boehm v. Board of County Commissioners,* 194 Kan. 662, 400 P. 2d 739; *Smith v. Reno County Comm'rs,* 121 Kan. 444, 247 Pac. 1046.) In making their determina-

tion they may consider any factors which a prudent man would consider relevant, and are not limited to any one controlling fact. We think the likelihood that any existing service will continue is one such relevant factor.

Thus, the city officials who first agreed to subsidize plaintiff properly considered that the funeral directors were faltering and going out of the ambulance business as a factor in determining that a need then existed, even though service was still being provided. Similarly, when plaintiff first approached the county commissioners for a subsidy the fact that the cities were about to discontinue their subsidies, together with plaintiff's professed inability to operate without governmental aid, was a proper matter for the commissioners to consider in determining whether there would be adequate service—again, even though service was still being provided.

If plaintiff's theory were correct, he himself would have unlawfully collected $6,500 from Osborne county during his thirteen months of subsidy. Under his theory the fact that he was furnishing service at the time would have precluded the commissioners from contracting with him in the first place. Alternatively, even if his previous service did not meet the "minimum standards" set by the contract (the record is silent on that subject) the moment he started operating under his contract—and therefore, by his definition, began furnishing adequate ambulance service—the commissioners were deprived of their authority to *pay* him.

The argument is self-defeating, and we reject it as a proper construction of the statute. "Adequate ambulance service" must be read to mean service provided by some agency, public or private, not being subsidized by the county. Further, as indicated, in determining whether such service is adequate we think the commissioners are entitled to consider among other things the likelihood of the existing service continuing. Factors which might reasonably be thought to bear on that likelihood include the past financial success of the venture, the public or private financial resources of the operator, and any indications of the operator's future intent.

Putting an ambulance service in operation requires time both to acquire equipment and to train personnel. We do not believe the commissioners must sit idly by in the face of the threatened termination of service, or that in this case they were required to wait to see whether plaintiff would actually carry out his threat. The commissioners were not required to gamble the health and lives of their constituents on the remote possibility that plaintiff

might continue his service; the public welfare could not be made to depend on plaintiff's whim.

In this case the award of the contract to Burch carried with it an implied finding that after July 31, 1970, the service of plaintiff would not be adequate. There was no finding or even any allegation that the award of the contract—and with it the implied finding —was the result of arbitrary or capricious action by the commissioners or the result of anything but their good faith efforts to solve a continuing community problem which had been thrust upon them by the retirement of the funeral directors and the termination of the previous municipal subsidies, and which was currently aggravated by the increased demands of plaintiff.

Were there reasonable grounds for the commissioners' conclusion that after plaintiff's contract expired there would not be "adequate ambulance service" in that part of the county he was serving? In June, 1970, the commissioners knew that the funeral directors had found ambulance service a losing business; that plaintiff had repeatedly told them that $500 per month subsidy was not enough to keep him going and that unless he got $1,000 he would have to quit; and that plaintiff had refused to finish the year at $500. (His only retreat from that position, so far as they knew, was his apparent willingness to accept $750.) We think they were amply justified in concluding that if there was to be ambulance service in Osborne county after July 31, at a price they were willing to pay, it would have to be furnished by someone else.

It is true that plaintiff in fact continued to operate after his contract expired. However, the decision of the commissioners must be judged in the light of the circumstances at the time they made it, not in the light of hindsight. Had plaintiff advised the commissioners that he wished and intended to operate without a subsidy it may be more doubtful that they could have properly found a need for county-financed service. (Even that is not certain, for they might well have found that his repeated statements of need and the financial history of ambulance operations in Osborne county indicated plaintiff's probable collapse in the near future.) He did not indicate any such intention, however. Quite the contrary, he repeatedly insisted on a doubling of his subsidy, and said he would have to quit if he didn't get it. We think the commissioners were entitled to take him at his word and are not to be faulted for failing to anticipate his present position.

Since the contract with Burch was entered into within the authority of the commissioners, it was error to enjoin them from carrying out its provisions. The judgment is reversed with directions to enter judgment for the defendants.

APPROVED BY THE COURT.