No. 80,566

WILLIAM R. HICKMAN TRUST, WILLIAM R. HICKMAN and LINDA HICKMAN, Trustees, *Appellants*, v. CITY OF CLAY CENTER, KANSAS, *Appellee*.

(974 P.2d 584)

Opinion filed March 5, 1999.

*Mark Edwards*, of Hoover, Schermerhorn, Edwards, Pinaire & Rombold, of Junction City, argued the cause and was on the brief for appellants.

*Donna J. Long*, city attorney, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Pursuant to K.S.A. 12-1750 *et seq.*, the City of Clay Center (City) condemned the Tankersley Hotel, owned by the William R. Hickman Trust. William and Linda Hickman, as trustees, filed this action seeking to enjoin the City from taking any further steps toward demolition of the hotel. In a counterclaim, the City sought an order requiring demolition at the owner's expense. The request for a permanent injunction was denied; demolition at the owner's expense was ordered. The Trust and the

Hickmans appealed. The appeal was transferred to this court from the Court of Appeals pursuant to K.S.A. 20-3018(c).

In a letter dated January 6, 1997, the Hickmans were advised that Jerry Davies and Jerry Dieker, Clay Center Public Officers, found the Tankersley Hotel to be in violation of the City's Minimum Housing Code.

On February 5, 1997, structural engineer James Urban wrote to the mayor reporting on Urban's inspection of the Tankersley and concluded: "This building is in a very dangerous condition and no one should be allowed access to the building and the area surrounding the building including the public sidewalk and adjacent properties." Also on February 5, Dieker wrote to the Hickmans' counsel, advising that a structural engineer had inspected the Tankersley and declared it to be "in a state of imminent collapse." Dieker barricaded streets, sidewalks, and alleys around the building, had utilities disconnected, and ordered part of an adjoining building to be vacated.

In a February 12, 1997, communication from Davies and Dieker to the city council, the public officers stated:

"We found the structure to have serious structural defects which render it unsafe to occupy and believe that it poses a serious threat to adjoining property and the general public. Our findings have been substantiated by the inspection of the building by a structural engineer, Mr. Jim Urban, of Wilson and Company, Salina, Kansas. A copy of his written report is attached to this statement for your information.

"Therefore, under the guidance of KSA 12-1750 through 12-1756, pertaining to the removal of unsafe structures, we ask the governing body of the City of Clay Center to begin proceedings to remove the structure. Because of the extent of deterioration of the structure as detailed in the condition report submitted by the structural engineer, we believe that time is of the essence for the removal of the building."

On February 13, 1997, Dieker wrote to the Hickmans' counsel, advising that the City was proceeding under K.S.A. 12-1750 *et seq.*, rather than under the City's Housing Code and it was expected that a resolution regarding demolition of the Tankersley Hotel would be adopted at the February 18, 1997, city council meeting.

On February 18, 1997, the city council adopted Ordinance 2059 designating the public officer as an "enforcing officer" pursuant to

1024

K.S.A. 12-1750 *et seq.* and charging him with administration of the "Act concerning repair or removal of unsafe buildings." The ordinance became effective upon publication in The Clay Center Dispatch on February 20, 1997.

Also at the February 18 meeting, the city council received the report of enforcing officers Dieker and Davies, finding the Tankersley Hotel to be unsafe and dangerous. The city council then adopted Resolution 1272, which stated in part: "[T]he enforcing officer as defined by K.S.A. 12-1750 . . . filed with the City a statement in writing that the building known as the Tankersley Hotel . . . is unsafe and dangerous." The resolution fixed April 1 as the date for the owners to show cause why the building should not be condemned and ordered repaired or demolished.

On February 25, 1997, the City sent a copy of Resolution 1272 to the Hickmans by certified mail. It was not claimed. The Hickmans' counsel was kept advised by letters from the city attorney.

City council minutes from April 1, 1997, contain the following:

"Before the Council meeting . . . there was a Public Hearing in regards to the demolition of the Tankersley Hotel . . . . The Hearing was to give the owners a chance to give a plan on fixing the building or letting the city demolish it if it does not get fixed up to building code. The [Hickmans'] attorney, Norbert Marek Jr., and a [structural] engineer representing the City, Jim Urban, each appeared before the Council expressing their opinions about the building. Bill Hickman presented some drawings he had made that he feels when implemented would bring the building up to code. After much discussion the Public Hearing was closed.

"Mr. Hickman wants to repair the building so it can be used for storage. He is willing to fix the building if City Council would give him the time to do so. Moved [and] seconded . . . to have Mr. Hickman's engineers, Bartlett & West of Topeka, Ks. give the city an idea when they could do a complete engineering of repairs needed to the old hotel before the next council meeting so a Resolution could be prepared to give the amount of time needed to repair the building to meet city building codes. The motion carried unanimously."

At its April 15, 1997, meeting, the city council adopted Resolution 1273, which gave the Hickmans until May 6 "to obtain engineering drawings and apply for a building permit to repair the structure." Resolution 1273 was published on April 16, 1997. A copy was sent to the Hickmans by certified mail on April 22, 1997.

It was unclaimed. The Hickmans' counsel was advised of the action in a letter dated April 17, 1997, from the city attorney.

On April 28, 1997, Alan Gast, the structural engineer with Bartlett & West, Topeka, engaged by the Hickmans, wrote to them, recommending what repairs should be undertaken. In their brief, the Hickmans assert that on April 28, 1997, they submitted "engineering drawings" and applied for a building permit for the purpose of repairing the structure. In a letter dated May 6, 1997, James Urban told the mayor that the repairs to bearing walls and foundation outlined in the letter from their consulting engineer to the Hickmans were acceptable, and Urban suggested requiring certain additional information and additional repair work.

At its May 6 meeting, the public officers told the city council that the information they received from the Hickmans' engineer was insufficient and recommended that more detailed information be required. The city council voted to require more detailed repair plans by May 19, 1997. In response and apparently in accord with communication between the city attorney and the Hickmans' counsel, William Hickman wrote a letter supplying practical information about how the repairs recommended by Gast would be accomplished.

The minutes of the May 20, 1997, city council meeting reflect that Urban expressed "some concern about some of the planned repairs and doesn't feel the cost of repairs would pay to use the building as storage." According to the minutes of the May 20 meeting, the Hickmans were not in attendance "to answer many questions the Council has about the building." The city council voted to reject the building permit application for repairs to the Tankersley Hotel.

In Resolution 1273, which had been adopted by the city council on April 15, the finding was made "that the structure is unsafe or dangerous." In the Resolution, the city council "direct[ed] the owner to obtain the necessary information to repair the structure and [make] the premises safe and secure." With the city council's rejection of the Hickmans' application for a building permit for repairs to the building, the next sentence of Resolution 1273 became operative: "If the owner fails to provide a building permit

that satisfactorily will repair the structure by May 6, 1997, then the City Council orders the owners to remove the structure and make the premises safe and secure by June 2, 1997."

The Hickmans filed this action on June 4, 1997. They alleged that the City acted arbitrarily and capriciously in rejecting their proposed repairs to the Tankersley Hotel and deciding that it should be demolished.

An evidentiary hearing was held on July 31, 1997, for the purpose of the Hickmans' request for a temporary injunction.

The Hickmans have owned the Tankersley for approximately 6 years and use it for storage of construction materials. The building stands on a side street, not a heavy traffic area.

William Hickman is a contractor, has done some building renovation, and knows about structural matters. When he got a request from the City for more information with regard to his building permit application for the Tankersley, he checked with the city attorney about how to supply the information. His letter of May 19 was the result. Hickman testified that he had not figured overall cost for the necessary repairs. He would be able to keep the cost down because the repairs would be done by him and his crews.

Gast testified that the building was "in very poor condition," but that it was not in a state of imminent collapse, as Public Officer Dieker had stated. In Gast's opinion, the building would be structurally stable and functional with the repairs suggested by him and Hickman.

Urban, the engineer hired by the City, testified that he did not disagree with Gast's recommendations. At the May 20 meeting, Urban told the city council that he thought "it would be more expensive to repair the building than it would be to demolish it." He testified that Hickman had addressed all the structural considerations in his May 19 letter, but he did not believe that Hickman had given quite enough detail in paragraph 2. Paragraph 2 of the repairs recommended by Gast stated: "Re-build the exterior masonry wall at the southwest corner and other locations on the west wall where the wall is bulging outward. The cement based coating on the outside of the walls should be removed and replaced at all locations where it is failing." Hickman's May 19 letter that ex-

plained the plans for making Gast's recommended repairs stated in paragraph 2:

"2) Remove a section of the wall that is bad, install ¾" diameter reinforcement bars and repour section of concrete, after that section has cured repeat the process. I visualize 2 pours along the south side and possibly 1 on the west. If necessary this may extend to the basement floor. The eaves through from the roof will need to be repaired or replaced as necessary to route the rain water off the roof away from this corner of the building."

William Mankin, an architect employed in the same firm as the engineer hired by the City, looked at the building in late June. He recommended demolition because his estimate of the cost of repairing the building to satisfy building codes was $700,000 to $750,000. With regard to the demolition cost, he testified only that $25,000 would have to be spent for repairs so that an asbestos removal contractor could get in before demolition could begin. In a letter dated July 3, 1997, to the mayor, Mankin stated that "the building does have what appears to be Asbestos Containing Materials (ACM) present." An "Estimate of Project Cost," dated July 3, was attached to Mankin's letter to the mayor. Mankin estimated $25,000 for temporary shoring for asbestos removal and $25,000 for asbestos testing and removal. His total estimated cost for the demolition project was $240,000. The only testimony about his estimates was about the cost and purpose of the temporary shoring.

The mayor testified that in his opinion, the city council members voted against allowing the Hickmans to repair the building because "[t]hey felt that they did not get everything that they had asked for from Mr. Hickman in the previous letter that was sent to him." The record does not contain a letter to Hickman requesting additional information. The first paragraph of Hickman's May 19 letter states:

"Norbert Marek [Hickmans' counsel] had a phone conversation with Donna Long [city attorney] on May 13, to determine the nature and extent of the additional plan requirement as well as who could prepare this plan. Donna Long told Norbert Marek that the additional detailed plans need to explain how the repairs addressed on page 2 of a letter from Bartlett and West dated April 28th, were going to be implemented. Donna [L]ong also told Norbert Marek that the plan for rectifying these deficiencies could be explained by Bill Hickman."

A city council member testified, "I voted to deny the building permit mainly because we had required an engineer to draw up the—what was going to be done inside the hotel mainly because of the Uniform Building Code and that was not done."

Public Officer Dieker offered the opinion that the building is not repairable. The reason he gave was that the cost of repair would exceed 300% of the building's assessed valuation, which "is only about $7,000 including the lot." According to Dieker, spending more than 300% of assessed valuation for renovation is a violation of the City Housing Code.

At the end of the hearing, the district judge announced that the Hickmans would not be likely to prevail in an attempt at a final injunction because "the cost of repair outweighs the economic viability of the building." Thus, he concluded that "the City's actions are not arbitrary or capricious, that they were taken in accordance with statute, in accordance with City ordinance, and based upon the advice and consultation of their engineers, their architects, and their inspections." He further concluded that the Hickmans "should have the opportunity to take the building down themselves at their own cost" and in accordance with applicable statutes and regulations. In response to questions by the district judge, the city attorney conceded that the length of time the Hickmans were given after the May 20 decision in which to demolish the Tankersley was unreasonable.

In the journal entry, the district court stated that the cost of repairing the Tankersley would be approximately $700,000, which "outweighs the economic viability of the building." The district court found no arbitrary or capricious action by the City, and it ordered that the hotel be demolished. The district court gave the owner 6 months in which to accomplish demolition before the City was authorized to take over.

New counsel entered an appearance for the Hickmans and filed a motion to alter, amend, and vacate the district court's order. The arguments centered on procedural defects. After considering submissions by both parties, the district court denied the Hickmans' motion. The district court stated:

"The City of Clay Center committed several procedural irregularities in trying to comply with K.S.A. 12-1750 *et seq*. It got the cart before the horse in receiving a report from its enforcement officer before that officer was officially established. It was late by a couple of days on a couple of occasions in mailing required notices to plaintiffs. Be that as it may, the court asks itself, so what? The record of exhibits attached to plaintiffs' motion shows that plaintiffs refused to pick up mailings for several weeks and the mailings were ultimately returned to defendant City. Plaintiffs apparently received sufficient notice of the administrative proceedings from their then attorney because they attended both the April 1st and April 15th city council meeting. Counsel for the City asked plaintiffs' counsel in her March 19th letter if he had any problems with the procedure that had been followed to date. Apparently he never responded.

"Plaintiffs were given the opportunity on April 1 to return to an adjourned meeting on April 15th to provide information to city officials and staff. A fair reading of the minutes clearly implies the meeting was adjourned. Plaintiffs were given the opportunity to apply for a building permit in May and were given an opportunity to provide the City with their engineer's report. Ultimately the City relied upon its experts in its decision to seek demolition of the hotel building.

"The right of due process is simply the right to be heard in a meaningful way and to controvert positions contrary to one's own. Clearly the plaintiffs in this case have been provided due process by both the defendant City and by this case [*sic*]. What would the plaintiffs have done any differently if the City had been technically correct in its enactment of the resolutions in question? The obvious answer is nothing. They have been provided the opportunity to make their case to the city council and to this court. The court finds that they have waived any procedural defects in the proceedings. They have had their day in court and now it is time for them to demolish their building."

The Hickmans first contend that the City deviated from the statutory procedure in the following respects: (1) The City had no enforcing officer when it adopted Resolution 1272 requiring the Hickmans to show cause why the Tankersley Hotel should not be condemned; (2) the City failed to timely mail a copy of Resolution 1272 to them; (3) the City failed to timely mail a copy of Resolution 1273 to them; and (4) the City waited until April 15 to make findings on the evidence submitted at the public hearing of April 1.

The district court ruled that the Hickmans had waived any procedural defects, and the Hickmans take issue with that determination. The City does not contend that it precisely followed the statutory procedure. It argues, however, that the Hickmans' active participation in the process, with the advice of counsel, constitutes a waiver of any procedural defects.

Cities are authorized to cause the repair or removal of or to remove dangerous structures. K.S.A. 1998 Supp. 12-1751(a). The preliminary procedure for doing so is set out in K.S.A. 1998 Supp. 12-1752, which provides:

"Whenever the enforcing officer files with the governing body of the city a statement in writing that any structure . . . is unsafe or dangerous . . . the governing body, by resolution, shall fix a time and place at which the owner . . . may appear and show cause why such structure should not be condemned and ordered repaired or demolished . . . . Such resolution shall be published once each week for two consecutive weeks on the same day of each week. At least 30 days shall elapse between the last publication and the date set for the hearing. A copy of the resolution shall be mailed by certified mail within three days after its first publication to each such owner . . . ."

The procedural framework continues in K.S.A. 1998 Supp. 12-1753:

"On the date fixed for hearing . . . the governing body shall hear all evidence submitted by the owner . . . as well as evidence submitted by the enforcing officer filing the statement and shall make findings by resolution. If the governing body of the city finds that such structure is unsafe or dangerous, such resolution shall direct the structure to be repaired or removed and the premises made safe and secure. . . . Such resolution shall be published once in the official city paper and a copy mailed to the owners . . . in the same manner provided for the notice of hearing. The resolution shall fix a reasonable time within which the repair or removal of such structure shall be commenced . . . ."

K.S.A. 12-1755(b) makes the property owner liable for costs of demolition and makes payment due within 30 days of the owner's receiving notice of the costs incurred.

The Hickmans contend that the City has an obligation to the public to comply strictly with the statutory procedure for repair or removal of unsafe structures, which, according to the Hickmans, is intended to protect rights of the public. The Hickmans quote 28 Am. Jur. 2d, Estoppel and Waiver § 164, p. 850, for the proposition that "one cannot waive a public obligation created by statute." The Hickmans misconstrue the principle, as is evident from a more complete quotation:

"As a general thing, rights granted by statute may be waived unless the statute is intended to protect the general rights of the public rather than private rights. While one cannot waive a public obligation created by statute, he may waive a

statutory requirement the purpose of which is to confer a private right or benefit, such as . . . the right of stockholders to notice of corporate meetings." 28 Am. Jur. 2d, Estoppel and Waiver § 164, pp. 850-51.

Thus, the party for whose protection the requirement is made may waive it. In this case, there was no bar to the property owners' waiving procedural requirements of the unsafe structures statutes.

The City contends that the Hickmans waived defects by their failure to object at the time of the administrative proceedings, their full participation in the administrative proceedings, and "their failure to present evidence or argue these matters before the trial court." The last of these contentions ignores the motion for reconsideration which was filed by the Hickmans' new counsel. The other two contentions involve the Hickmans' dealings with the city council.

In the present case, the mandatory notice and hearing requirements of the unsafe structures statutes codify procedural due process rights embodied in the United States Constitution. Of the four complaints the Hickmans make of procedural defects, two involve the constitutional requirement of notice. The other two complaints—that the enforcing officer was not timely appointed and that findings were not made by the city council on the same date as the hearing—do not implicate any substantial rights of the property owners.

A somewhat analogous statute was at issue in *City of Wichita v. Meyer*, 262 Kan. 534, 939 P.2d 926 (1997). The questions concerned statutory defects in a condemnation proceeding initiated by the City of Wichita to acquire land for a public ice rink. REM was the owner of the property at issue, tracts 47 and 48:

"The City did not comply with K.S.A. 26-502 and K.S.A. 26-503. The City failed to name REM and to list tracts 47 and 48 in its initial condemnation petition and also failed to include REM in the initial publication and mailing following the filing of the petition. REM was not notified that its property (tracts 47 and 48) was being condemned by the City, and was not given notice of the date fixed for the court to consider the initial petition and to appoint appraisers. The record is conflicting about whether REM received notice of the January 25, 1995, appraisers' hearing. REM was denied the opportunity of any input into the selection of appraisers. REM was given that opportunity after the City filed its amended pe-

tition and a different panel of appraisers was appointed (although two of the three were the same), resulting in a substantially higher award.

"REM would have known that its property was being condemned, at the earliest, after the initial appraisers were already appointed. Even if notice was given of the hearing of the initial appraisers' report, and that notice also listed tracts 47 and 48, REM could have been confused because it was not given any notice that a condemnation petition had been filed against its property. The ex parte order authorizing the petition amendment did not mention REM or tracts 47 and 48. The order was not filed until January 30, 1995, the date the first appraisers' report was filed. As previously discussed, the petition amendment adding REM and tracts 47 and 48 was not filed until March 2, 1995. These vital failures in the initial petition (the jurisdictional instrument) and in statutory notice void the proceeding. See *Dick* [*v. Drainage District No. 2*], 187 Kan. [520,] 527[, 358 P.2d 744 (1961)]. The large discrepancy between the first ($29,000) and second ($132,325) appraisals implies that REM was prejudiced by the statutory defects in the first appraisal." 262 Kan. at 544-45.

This court's analysis of the statutory defects in the initial condemnation award touched on what adverse effects there were to REM from the city's failure to follow the statutory procedure. The eminent domain statutes call for this "harm analysis." K.S.A. 26-502 provides that a defect in the form of the petition "which does not impair substantial rights of the parties" will not invalidate a proceeding.

The legislature's inclusion of a specific harmless error rule within the Eminent Domain Procedure Act is in keeping with the somewhat self-contained and comprehensive nature of that statutory procedure. For the purpose of our inquiry, the *City of Wichita* case answers in the affirmative any question about the application of the harmless error rule to irregularities in procedural due process requirements. Without a specific harmless error provision in the unsafe structures statutes, though, the present case is not strictly analogous to *City of Wichita*.

The Hickmans would liken this case to an annexation proceeding and cites *State, ex rel., v. City of Topeka*, 173 Kan. 387, 391, 246 P.2d 250 (1952), for the rule that the "[f]ailure of the city to comply with requirements of the legislative enactment which gave it the power and authority to annex territory nullifies the attempted annexation ordinance." In that case, the city's effort to comply with procedural requirements fell far short of the mark. The legislation

required that at least 10 days before the governing body could act to approve an annexation ordinance, the city clerk had to notify the county clerk and the county superintendent in writing *of the proposed ordinance*. The only attempted notice did not mention an ordinance, and, in fact, at the time the notice was given the proposed ordinance did not exist. The court referred to the attempted notice as "the pretended notice," 173 Kan. at 390, and further commented that it "amounted to no notice whatsoever." 173 Kan. at 391. In other words, it did not fulfill the purposes contemplated by the legislature of imparting information and affording "all persons and governmental bodies affected thereby an opportunity to examine the ordinance and its contents for the purpose of taking such action as they may deem advisable." 173 Kan. at 391.

The Hickmans also cite a more recent case, *In re Petition of City of Shawnee for Annexation of Land*, 236 Kan. 1, 13, 687 P.2d 603 (1984), in which the board of county commissioners modified its order on a petition for annexation after "spread[ing] the same upon the journal of proceedings of the board." The standard applied by the court was that of substantial compliance with the statutory procedure. Upon reviewing the annexation statutes and finding no provision that would permit reconsideration or modification of an order granting or denying a petition for annexation once it had been "journalized," the court concluded that the board's action did not substantially comply with the statutory procedure. 236 Kan. at 13.

"Substantial compliance" has been defined by the court as requiring "compliance in respect to the essential matters necessary to assure every reasonable objective of the statute." *Sabatini v. Jayhawk Construction Co.*, 214 Kan. 408, Syl. ¶ 1, 520 P.2d 1230 (1974). When viewed in this way, as a qualitative matter rather than simply as a quantitative one, the substantial compliance standard shares close identity with the harmless error rule. Taking the measure of the present case with either standard leads to the conclusion that the City's action need not be disturbed solely on account of procedural irregularities. Although the City's procedural performance was unquestionably deficient, it does not seem to have prevented accomplishment of the statutes' objective. With

respect to harmless error, the Hickmans make no real claim that they were prejudiced as a consequence of the procedural irregularities.

We have no hesitancy in finding that the Hickmans waived the City's failure to timely appoint the enforcing officer and the failure to make its findings on the same date as the hearing. As previously noted, the City's failure to provide timely notice implicates procedural due process rights.

Obviously, the Hickmans cannot waive procedural due process that it was not aware of. In *Nguyen v. IBP, Inc.*, 266 Kan. 580, 972 P.2d 747 (1999), this court said:

"In *Mullane v. Central Hanover Tr. Co.*, 339 U.S. 306, 314, 94 L. Ed 865, 70 S. Ct. 652 (1950), the United States Supreme Court noted that while the fundamental requisite of due process of law is the opportunity to be heard, this right has little reality or worth unless one is informed of the pending matter and can decide whether to participate."

Here, there is no claim that the Hickmans did not have notice or suffered harm due to the City's failure to timely mail copies of the pertinent resolution to them. We know from the record that the Hickmans had consulted with counsel prior to the April 1 meeting. In fact, starting January 23, the city attorney kept the Hickmans' counsel advised of the City's action. The Hickmans' counsel appeared at the April 1 meeting and presented their position on implementing repairs to the hotel. The Hickmans' counsel was subsequently advised of actions taken by the City. The Hickmans' engineers responded to the City's April 1 request by submitting engineering drawings showing reasonable repairs to be made to the hotel. William Hickman subsequently responded by letter to the City's May 6 requirement for a more detailed repair plan. In *Crane v. Mitchell County U.S.D. 273*, 232 Kan. 51, 56, 652 P.2d 205 (1982), we said: "This court has often held the essential elements of due process of law are notice and an opportunity to be heard and to defend in an orderly proceeding adapted to the nature of the case." We agree with the district court that the Hickmans were provided the opportunity to present its case to the City and the trial court. The district court correctly found that the Hickmans were not denied procedural due process.

In moving beyond procedure to the Hickmans' challenge to the action taken by the City, the parties agree that the standard for this court's review is whether it was arbitrary or capricious. We recently stated: "This court has defined 'arbitrary' to mean without adequate determining principles, not done or acting according to reason or judgment; 'oppressive' as harsh, rigorous, or severe; and 'capricious' as changing, apparently without regard to any laws." *Dillon Stores v. Board of Sedgwick County Comm'rs*, 259 Kan. 295, Syl. ¶ 3, 912 P.2d 170 (1996).

Both parties cite *Tingle v. City of Wichita*, 211 Kan. 119, 505 P.2d 717 (1973), as the only case construing the provisions of K.S.A. 12-1750 *et seq*. Neither party, however, contends that *Tingle* provides much guidance for the present appeal. It was stipulated in *Tingle* that "the structure was properly found to be unsafe and dangerous and a fit subject for condemnation upon the adjudication by the governing body of Wichita to that effect." 211 Kan. at 120. Tingle, the property owner, undertook to repair the property, but after awhile his efforts flagged. He was on notice, as required by the statute, that if he failed to diligently prosecute and complete the repairs, the city could demolish the structure. When the city demolished the building, Tingle sued for damages. This court was of the opinion that only a question of fact was involved and that "the jury had ample evidence to find the appellant had abandoned repair so as to authorize the city to raze the structure." 211 Kan. at 124. Judgment for the city was affirmed. The court's review of the jury verdict in *Tingle* did not call for consideration of a standard for reviewing decisions made by a governing body under K.S.A. 12-1750 *et seq*.

In *Robinson v. Board of County Commissioners*, 210 Kan. 684, 690-91, 504 P.2d 263 (1972), the court noted that the elected officials were charged with resolving practical questions:

"[I]t is they who are the watchdogs of the public purse. Their judgment on matters entrusted to their discretion is not subject to review except for arbitrariness, capriciousness or bad faith. [Citations omitted.] In making their determination they may consider any factors which a prudent man would consider relevant, and are not limited to any one controlling fact."

In more recent cases, the emphasis has shifted slightly from what factors officials are permitted to consider to whether all relevant factors were considered. The action of the Clay Center City Council was taken pursuant to the state statutes in order to carry out the policies and purposes declared by the legislature and, hence, was in the nature of an administrative act. As stated in *Lawrence Preservation Alliance, Inc. v. Allen Realty, Inc.*, 16 Kan. App. 2d 93, 102-03, 819 P.2d 138 (1991), *rev. denied* 250 Kan. 805 (1992):

"The standard of review for appeals from administrative action is well-settled:

' "A district court may not, on appeal, substitute its judgment for that of an administrative tribunal, but is restricted to considering whether, as a matter of law, (1) the tribunal acted fraudulently, arbitrarily or capriciously, (2) the administrative order is substantially supported by evidence, and (3) the tribunal's action was within the scope of its authority.

' "In reviewing a district court's judgment, as above, this court will, in the first instance, for the purpose of determining whether the district court observed the requirements and restrictions placed upon it, make the same review of the administrative tribunal's action as does the district court." ' *Board of Johnson County Comm'rs v. J.A. Peterson Co.*, 239 Kan. 112, 114, 716 P.2d 188 (1986) (quoting *Kansas State Board of Healing Arts v. Foote*, 200 Kan. 447, Syl. ¶¶ 1 and 2, 436 P.2d 828 [1968]).

See *DSG Corp. v. Shelor*, 239 Kan. 312, 315, 720 P.2d 1039 (1986); K.S.A. 77-621."

The Court of Appeals added that the administrative action may be found to be invalid if the governing body erroneously interpreted or applied the law. 16 Kan. App. 2d at 103.

With regard to considering whether the governing body acted arbitrarily or capriciously, the Court of Appeals stated:

"It is well settled that failure to follow statutory mandates constitutes arbitrary and capricious action by an administrative body. In *Citizens to Preserve Overton Park [v. Volpe*, 401 U.S. 402, 28 L. Ed. 2d 136, 91 S. Ct. 814 (1971)], the United States Supreme Court stated:

'Scrutiny of the facts does not end, however, with the determination that the Secretary has acted within the scope of his statutory authority. Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1964 ed., Supp. V). To make this finding *the court must consider whether the decision was based on a consideration of the relevant factors* and whether there has been a clear error of judgment.' 401 U.S. at 416. (Emphasis added).

"In *In re Dept. of Energy Stripper Well Exemption,* 520 F. Supp. 1232, 1269 (D. Kan. 1981), *rev'd on other grounds* 690 F.2d 1375 (Temp. Emerg. Ct. App. 1982), *cert. denied* 459 U.S. 1127 (1983), the United States District Court for Kansas concluded 'that the "relevant factor" test is an integral part of the "arbitrary and capricious" test, and that the record of the administrative decision must affirmatively show consideration of the relevant factors underlying the regulation to sustain that regulation.' " 16 Kan. App. 2d at 103.

The Court of Appeals also cited *Benton Franklin Riverfront Trailway v. Lewis,* 701 F.2d 784, 788 (9th Cir. 1983), where it was said: "The court must ascertain whether the agency took a hard look at all relevant factors and whether the alternatives set forth are sufficient to permit a reasoned choice." Upon doing so, the court concluded that failure to consider the possible availability of federal funds for rehabilitation or preservation rendered the administrative action arbitrary. 16 Kan. App. 2d at 103-04.

Some information that was available to the district court was not available to the members of the city council at the time they rejected the Hickmans' building permit application and ordered demolition of the building. From the record before the court, it appears that the following information and advice formed the basis for the City's decision:

On February 5, Urban wrote that the building was in a very dangerous condition so that persons should not be allowed to enter it or use the sidewalk and adjacent properties.

In April, pursuant to Resolution 1272, the Hickmans appeared before the city council to show cause why the building should not be condemned and ordered repaired or demolished. The city council adopted Resolution 1273, which directed "the owner to obtain the necessary information to repair the structure and [make] the premises safe and secure."

On April 28, Gast wrote to Hickman recommending certain repairs. Five pages of drawings accompanied the letter.

On May 6, Urban wrote that he had reviewed Gast's report on repairing the building. With regard to the proposal for new bearing walls and foundations, Urban stated: "These recommendations may be accepted." With regard to Gast's recommendations for repairing the roof, windows, and doors, Urban suggested that the

Hickmans specify "exactly what type of repairs will be completed." With regard to Gast's recommendation to replace select portions of the exterior masonry walls, Urban suggested adding two more wall areas to those that would be repaired.

On May 6, at the city council meeting, Public Officers Davies and Dieker said "they did not get enough information from Hickman's engineer to be able to decide on a recommendation of the building permit."

On May 19, Hickman wrote to the city attorney to supply information about how the repairs recommended by Gast would be accomplished.

On May 20, the minutes of the city council meeting show that Urban expressed "some concern about some of the planned repairs" and said he did not "feel the cost of repairs would pay to use the building as storage." At the hearing in the district court, Urban testified that he told city council members at the May 20 meeting that "it would be more expensive to repair the building than it would be to demolish it."

At the May 20 meeting, the city council voted to deny the Hickmans' building permit application. When it voted not to allow the owners to repair the building, the city council had no estimates of the cost for repairs or for demolition. It had a report, recommendations, and drawings by the Hickmans' engineer. It had William Hickman's description of how the recommended repairs would be made. It had its own engineer's expressed reservations about "some of the planned repairs" and his expressed belief that the cost of repairing the building was not justifiable.

The mayor testified in the district court that the city council members voted to deny the building permit application because they had not gotten all the additional information they had requested from Hickman. Another council member testified that he voted to deny the application because the required engineer's drawings had not been provided. Urban testified that Hickman's letter of May 19 "addressed all of the major structural considerations," but Urban "just didn't think there was quite enough detail in . . . paragraph two." There is no contention that Hickman was

contacted for additional information after he submitted his May 19 letter.

On July 3, Mankin wrote that he and three other professionals, including Urban, inspected the building on June 23. He offered the opinion that "the building has deteriorated to such an extent that repair of the structure has become physically and economically impractical." Thus, his report does not address repairs. It focuses exclusively on demolishing the Tankersley. Attached to Mankin's letter is an "Estimate of Project Cost," with a total estimated cost for demolition and clean-up of $240,000.

At the hearing, Mankin testified that he estimated it would cost $700,000 to $750,000 to repair the building to satisfy building codes. He gave no basis or explanation for his figures.

Public Officer Dieker testified that the cost of repair would be more than 300% of the assessed valuation of the building. He asserted that repair of the building, therefore, would be in violation of the City Housing Code. He did not attempt to explain why a storage building would be subject to the Housing Code. He testified that he did not have a basis for his estimate of the cost of repair: "I really don't know. I'm not a structural engineer, but it's pretty obvious that when bricks are falling out of the walls and the floors are caving in it's going to cost a little bit of money to fix it." Dieker added, "I know $6,000 wouldn't do it."

Because the Hickmans' petition sought an injunction, evidence was submitted at the hearing and the district court's journal entry was framed in accordance with standards for injunctive relief. The portions of the journal entry that are relevant to whether the City's action was arbitrary or capricious are as follows:

"2. The cost of repair of the building known as the Tankersley Hotel outweighs the economic viability of the building. The City of Clay Center code still requires repairs be made according to the Uniform Building Code which the evidence shows would cost $700,000.

"3. The City of Clay Center was not arbitrary [or] capricious but took action according to Statute and followed the advice of their engineers and inspectors."

The district court was of the opinion that the Hickmans "should have the opportunity to take down the building" and they were given 6 months for demolition. "If the plaintiffs fail to complete

an appropriate demolition according to state and local requirements [within the time allotted], the City of Clay Center is hereby authorized to immediately enter and complete the demolition and charge the costs of the City's actions to the property owner."

The district court rested its decision squarely on economic considerations. There is, however, almost no solid economic information in the record.

As we have seen, the city council members had no estimate of the cost of repairs at the time they acted. The extent of their information, according to the record, was what the engineer told them at the May 20 meeting. The minutes reflect his saying that he did not "feel the cost of repairs would pay to use the building as storage." Later, Urban testified that he said "it would be more expensive to repair the building than it would be to demolish it." There is nothing in the record that would indicate that the city council had any estimate of the cost of demolition at the time it acted. Nor is there any mention of the value of the building to the Hickmans when used for storage. Probably due to the lack of economic information available to them, the city council members who gave reasons for the decision did not cite economic considerations.

In the district court, the $700,000 to $750,000 estimate of the cost of repairs was made by Mankin, the consulting architect. He also submitted an estimate for the demolition project that totaled $240,000, but that figure is not mentioned and does not appear to have been a factor in the district court's decision. Nor is there any attempt to assess economic consequences beyond initial cost, and a decision based on economic factors is deficient without all relevant economic factors. In particular, it does not appear that any consideration has been given to the possibility that the Hickmans might have to spend a fair amount of money to demolish their building and then have nothing but an empty lot to show for it. If economic justification were going to be the basis for the decision, consideration should have been given to whether the Hickmans would be better off in the long run investing the greater sum in renovating the building than in paying less for demolition. For the property owners, the bottom line may not be represented by a

determination that "it would be more expensive to repair the build-
ing than it would be to demolish it."

The reason given by city council members for their decision was
lack of information about proposed renovations. If the Hickmans
provided what had been requested from them, the stated reason
for the City's action would have no basis in fact. The record does
not conclusively show whether the Hickmans and their consulting
engineer provided all that was requested. The May 20 city council
meeting minutes state: "Jim Urban, representing Wilson & Co.,
appeared before the Council to discuss the recent information
from William Hickman in regard to the repairs of the old Tank-
ersley Hotel. Mr. Hickman did not send anymore [*sic*] information
from an engineer." There is an implication in the last sentence that
more information from an engineer was expected. The first para-
graph of William Hickman's letter of May 19, however, indicates
otherwise:

"Norbert Marek had a phone conversation with Donna Long on May 13, to
determine the nature and extent of the additional plan requirement as well as
who could prepare this plan. Donna Long told Norbert Marek that the additional
detailed plans need to explain how the repairs addressed on page 2 of a letter
from Bartlett and West dated April 28th, were going to be implemented. Donna
[L]ong also told Norbert Marek that the plan for rectifying these deficiencies
could be explained by Bill Hickman."

The minutes of the May 20 meeting also state that "Mr. Hickman
was not at the meeting to answer many questions the Council has
about the building." There is no indication that Hickman had been
advised or requested to attend the meeting.

The district court's task was to ascertain whether the city council
looked at all relevant factors. Instead, the district court looked at
incomplete economic evidence that had been submitted at the
hearing on injunctive relief and concluded that the city council's
decision was sound. Now it is this court's task to ascertain whether
the city council looked at all relevant factors. For all the reasons
stated in the preceding paragraphs, it is apparent that the city coun-
cil did not do so. The city council not only failed to consider the
economic impact of the various alternatives on the Hickmans, but
also, it injected the economic feasibility of repairing the hotel into

its considerations. The sole basis for the district court's denying the temporary injunction was that the cost of repairs exceeded the economic value of the hotel. The district court did not give any consideration to the meaning of K.S.A. 1998 Supp. 12-1753 and made no attempt to interpret the statute.

Where a " 'statute is plain and unambiguous, the court must give effect to the intention of the legislature as expressed.' " *Brown v. U.S.D. No. 333*, 261 Kan. 134, 142, 928 P.2d 57 (1996). In *Tingle*, 211 Kan. at 123-24, this court did interpret 12-1753:

"K.S.A. 12-1753 provides statutory authority for cities to find by resolution that, after prior notice and hearing, a particular structure is unsafe and dangerous. The statute requires the city to order the structure to be repaired or removed, and provides that the resolution shall fix a reasonable time in which the property owner may commence repair or removal on his own. More important, however, the statute further requires the city to put the owner on notice that if he fails to commence repair or removal within the specified time, *or fails to diligently prosecute the same until the work is completed, the governing body may cause the structure to be razed and removed.* Once the owner has been put on notice, his failure to diligently carry out repair on the property, authorizes the city to proceed to have the structure razed."

The purpose of the Unsafe or Dangerous Structures Act is to provide a procedure by which the owner of a structure is required to make it safe. A straightforward reading of 12-1753 requires a city to make a finding that the structure is unsafe or dangerous and authorizes the city to order the owner to "repair or remove" the structure and to do so within a reasonable time. If the owner refuses or fails to do so, then the city can demolish the building at the owner's expense. The plain language of the statute places the obligation for repairing or demolishing the structure initially on the owner. The city is required to give the owner the opportunity to do so within a reasonable time.

Here, the City made the requisite finding that the hotel was unsafe or dangerous, but it did not order Hickman to "repair or remove" the hotel. Instead, the City directed Hickman to submit engineering drawings for repairing the hotel. The city engineer essentially approved the engineer's drawings in that he found them acceptable but felt additional details should be provided. The City then made demolition of the hotel dependent upon Hickman's

providing the additional details and injected as a factor economic unfeasibility of the proposed repairs.

K.S.A. 1998 Supp. 12-1753 does not authorize the City to order the removal of the hotel based on the economic feasibility of repairing it. That is a decision that the owner must make, and if the owner is unable or unwilling to make the necessary repairs or demolish the building, then the City can demolish it at the owner's expense.

The City's failure to comply with the requirements of K.S.A. 1998 Supp. 12-1752 and 12-1753 and to consider all of the relevant factors renders the City's action arbitrary and capricious. Thus, the district court erred in finding to the contrary, and we reverse the district court's order denying the Hickmans' request to enjoin the City from proceeding to demolish the hotel pursuant to City Resolution 1273.

The judgment of the district court is reversed, and the case is remanded with directions to enjoin the City from demolishing or removing the hotel.